802 F.2d 160
 1987 A.M.C. 463
 CANTIERI NAVALI RIUNITI, Plaintiff-Appellee-Appellant,
v.
M/V SKYPTRON, et al., Defendants,
LUCIFER (PANAMA) S.A., Intervenor-Appellant-Appellee,
v.
TRAMP OIL & MARINE, LTD. and Redwood Bunkering, Ltd., et
al., Intervenors- Appellees-Appellants,
and
Societe Des Lubrifiants Elf Aquitaine (SLEA), Intervenor-Appellee.
LAKE CITY STEVEDORES, INC., Plaintiff-Appellee,
v.
M/V SKYPTRON, Her Engines, Tackle, Apparel, etc., et al., Defendants,
Lucifer (Panama) S.A., Intervenor-Appellee.
 No. 85-4809.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 14, 1986.
Rehearing Denied Nov. 19, 1986.
 
 James O.M. Womack, Burke & Mayer, New Orleans, La., for Lucifer (panama) S.A.
 Scofield, Bergstedt, Gerard, Mount & Veron, Scott J. Scofield, Benjamin W. Mount, Lake Charles, La., for Riuniti & Savoy Marine.
 Phelps, Dunbar, Marks, Claverie & Sims, George R. Wentz, Jr., George J. Fowler, III, New Orleans, La., for Lake City Stevedores.
 Jones, Tete, Nolen, Hanchey, Swift & Spears, Hunter W. Lundy, Lake Charles, La., for Tramp Oil & Marine & Redwood.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before THORNBERRY, JOHNSON, and WILLIAMS, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 A complete recitation of the rather complex facts and procedural background of this case is set out in the district court's scholarly opinion, 621 F.Supp. 171 at 175-78. We will note salient facts as they become important.
 
 
 2
 This case is essentially a priority dispute between various lien claimants asserting rights in the proceeds resulting from the court ordered sale of the Greek-flag bulk carrier M/V SKYPTRON. An Italian ship repairer, Cantieri Navali Riuniti, invoked an in rem admiralty proceeding by arresting the SKYPTRON at Lake Charles, Louisiana. The ship was later sold under a writ of Venditioni Exponas for $3,000,000. After the sale, various creditors intervened asserting claims of over $9,000,000. The crux of the dispute between the parties is whether the appellant Lucifer (Panama) S.A. ("Lucifer"), the holder of a preferred mortgage on the SKYPTRON, waived its preferred status as against certain liens arising under the International Convention for the Unification of Certain Rules Relating to Maritime Liens and Mortgages, L.N.T.S. 2765, signed in Brussels in 1926 ("Brussels Convention").
 
 Interpretation of the Mortgage
 
 3
 United States law, which the district court found applicable to this dispute, specifically provides for the creation of a preferred ship mortgage. 46 U.S.C. Sec. 951. The law provides that such a mortgage "shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court." 46 U.S.C. Sec. 953(b). No party disputes that Lucifer has a preferred mortgage under United States law and no creditor has argued that its claim falls within one of the two exceptions in Section 953(b). Rather, the creditors argue that Lucifer waived its preferred status under the terms of the mortgage.[1]
 
 
 4
 In determining that Lucifer had waived its preferred status as against certain claims, the district court focused on the language of paragraph four of the mortgage which reads in part as follows:
 
 
 5
 AS security for the payment by the Owner [ULTRAMAR] to the Mortgagee [LUCIFER] of the Outstanding Indebtedness ... THE OWNER as BENEFICIAL OWNER HEREBY GRANTS unto the Mortgagee a First Preferred Mortgage over the Vessel AS WELL AS the right to register same in the appropriate Greek Maritime Mortgages register without the Owner taking part therein AND HEREBY ASSIGNS to the Mortgagee all the Owner's rights deriving from [Article 13 of Greek] legislative decree 2687/1953 as authentically interpreted by legislative decree 2928/1954 and from Ministerial Decision Number 54259/80.... (Emphasis in original.)
 
 
 6
 Lucifer Exhibit No. 3 at 8-9.
 
 
 7
 On its face, this paragraph seemingly does nothing to diminish Lucifer's preferred status. However, the district court found that the reference to Greek Ministerial Decision 54259/80 created a partial waiver of preferred status. The decision concerned the Greek government's official approval of the renaming of M/V DOLORES DE PANDOLIT as M/V SKYPTRON and its approval of the mortgage to Lucifer.[2] Paragraph 19 of that decision provides:
 
 
 8
 The mortgage will precede all the maritime and other liens contrary for the provisions of Article 205 of the Civil Code of Greek Maritime Law, and of any other provisions of the Greek law, except only of the liens stated in Article 2 of the Brussels Convention.
 
 
 9
 Greek Ministerial Decision 54259/80 (certified translation from the Greek).
 
 
 10
 Lucifer argues that the language of paragraph four of the mortgage, even with the reference to the Greek Ministerial Decision, cannot be construed as a waiver of preferential status. Lucifer focuses on the use of the words "owner's rights" and argues that the priority given to Brussels Convention liens in the Greek Ministerial Decision is not a "right" of the "owner" that can be "assigned" to Lucifer. Rather, Lucifer argues, the preference given to Brussels Convention liens is a "liability" of the owner not covered by the assignment of the owner's "rights."
 
 
 11
 The interpretation of an unambiguous written agreement is a question of law that this Court reviews de novo. Chevron U.S.A., Inc. v. Belco Petroleum Corp., 755 F.2d 1151 (5th Cir.1985). We agree with the district court's conclusion that Lucifer has partially waived its preferential status. The Greek Ministerial Decision purported to approve both the renaming of the vessel and the mortgage agreement. Such approval was required under Greek law in order for a foreign corporation like Lucifer to take a mortgage on a Greek vessel. (Deposition of Paul Sarlis, attachment number 2.)[3] The decision allowed the owner to rename the vessel and mortgage its interest to Lucifer, subject to the requirement in the decision that Lucifer's mortgage be subordinate to valid Brussels Convention liens. These were the "rights" that the decision created and these rights, with the accompanying limitation on preferred status, were assigned to Lucifer in the mortgage.
 
 
 12
 This Court's decision in International Paint Co. v. M/V MISSION VIKING, 637 F.2d 382 (5th Cir.1981) is of no help to Lucifer. In that case, we held that a certain provision in a mortgage did not operate to waive the mortgagee's preferred status under United States law. The Court based its holding, however, on the presence of a specific "no waiver" clause contained in the mortgage. Lucifer's mortgage contains no such clause.
 
 
 13
 The district court thus correctly held that Lucifer had agreed that liens arising under Article 2 of the Brussels Convention would prime its mortgage. The court then went on to analyze whether the various creditors qualified for an Article 2 lien.[4]
 
 Brussels Convention Liens
 
 14
 Under the Brussels Convention of 1926, an Article 2 lien must meet the following five criteria:
 
 
 15
 1. The claim must result from contracts entered into or acts done
 
 2. By the master
 
 16
 3. Acting within the scope of his authority
 
 4. Away from the vessel's home port
 
 17
 5. Where such contracts or acts are necessary
 
 
 18
 a. for the preservation of the vessel or
 
 
 19
 b. for the continuation of the voyage
 
 
 20
 See International Convention for the Unification of Certain Rules Relating to Maritime Liens and Mortgages, Apr. 10, 1926, art. 2, L.N.T.S. 2765. (Brussels Convention of 1926).
 
 
 21
 Lucifer attacks all the creditors' claims arguing that they do not fall within the ambit of Article 2. Lucifer's primary and recurring objection is that the contracts in this case were not entered into by the master of the SKYPTRON, but by its owner.
 
 Cantieri's Claims
 
 22
 Cantieri Navali Riuniti ("Cantieri") asserts a lien for certain repairs performed on the SKYPTRON in Palermo, Italy. Lucifer argues that there can be no contract between the master of the SKYPTRON and the claimant because the claimant here, Cantieri, never signed a repair contract.
 
 
 23
 Looking to Louisiana law, the district court found that a contract did exist.[5] The master of the SKYPTRON signed his name and fixed the stamp of the vessel on the repair contract. The district court found that this action by the master was an offer which Cantieri accepted by performing the work. It is well established under Louisiana law that a contract may be accepted by the performance of one of the parties. LSA-C.C.Ann.Art. 1939 (West Supp.1986). Thus, a valid contract existed between the master and Cantieri. Lucifer does not dispute that the remaining requirements of Article 2 are met.
 
 Savoy Marine
 
 24
 Savoy Marine asserts an Article 2 lien based on supplies of food and other items furnished to the SKYPTRON in Madras, India. The district court found that the master had entered into a contract with Savoy Marine and that all the other elements of Article 2 had been satisfied.
 
 
 25
 Lucifer urges on appeal the same argument rejected by the district court--that the contract for supplies was not between the master and Savoy but between the SKYPTRON's owner and Savoy.
 
 
 26
 This argument is not persuasive. The owner of Savoy testified in deposition that the master of the SKYPTRON contacted him to arrange for delivery of the supplies. (Deposition of Mr. Ranakrishnan at 3-4.) The supplies were furnished, consumed, but never paid for. The district court correctly held that an Article 2 lien arose in Savoy's favor.
 
 
 27
 Societe Des Lubrifiants Elf Aquitaine (SLEA)
 
 
 28
 SLEA supplied various lubricants to the SKYPTRON on two separate occasions. The transactional chain extended from SLEA through a series of intermediaries and local suppliers. Lucifer argues strenuously on appeal that these transactions cannot qualify as contracts between the master and SLEA.
 
 
 29
 Lucifer's position is not in conflict with the district court's ruling. The court found that a contract did not exist between SLEA and the master, but only between the master and the immediate local supplier. The court went on to find, however, that since the local suppliers had received payment for the lubricants (from SLEA), SLEA "stepped into the shoes" of those suppliers under the Louisiana doctrine of subrogation.[6] 5 LA.STAT.ANN. art. 1829 (West Supp.1986). Lucifer points to no authority, and we have found none, which suggests any inappropriateness in applying subrogation principles to Article 2 liens.
 
 Redwood Bunkering, Ltd. (Redwood)
 
 30
 The district court heard expert testimony from a Greek lawyer as to the existence of a contract between the master of the SKYPTRON and Redwood for furnishing fuel to the vessel. Again, Lucifer argues that the contract was between the ship's owner and Redwood. Lucifer points to the "Master's Requisition for Oil Bunkers" executed by the master upon delivery of the fuel. The requisition states: "Charge same at the prices and in the manner agreed upon between owners and yourselves. Under your contract with my principals all deliveries are computed on soundings of the supplier's tanks or barges." (Redwood Exhibit Number 1(b)).
 
 
 31
 That the master incorporated a price agreed to by Redwood and the ship's owner should not prevent the formation of a contract. Under the applicable law, precise agreement as to price is not a prerequisite to contract formation. Grimaldi Plumbing & Heating Co. v. Doucette, 414 So.2d 832 (La.App. 4th Cir.1982). The ship owner's involvement in the transaction should not defeat the contractual relationship between the master and Redwood--especially in light of the master's request for and consumption of the fuel.
 
 Tramp Oil & Marine, Ltd. (Tramp)
 
 32
 Tramp's claim is similar to the one asserted by Redwood. As with Redwood, Lucifer points to language in the master's request form that allegedly prevents the formation of a contract. The language here is: "Please charge for at the price and in the manner agreed upon by my owners/agents and your good selves." (Tramp Exhibit Number 1(c)). As stated above, this kind of reference will not defeat the formation of a contract on these facts. Tramp delivered the fuel to the ship at the master's request and that fuel was consumed in the voyage. Tramp remains unpaid and thus may assert a valid Article 2 lien.
 
 
 33
 The district court additionally analyzed the claims of the supply and repair creditors under the doctrine of equitable subordination. Because we are affirming the district court on its analysis of the Brussels Convention liens, we do not reach the equitable subordination issue.
 
 Attorneys' Fees and Prejudgment Interest
 
 34
 Attorneys' fees are generally not awarded in admiralty cases. However, such fees can be awarded to the prevailing party if the opponent acted with malice or in bad faith. Noritake Co. v. M/V HELLENIC CHAMPION, 627 F.2d 724 (5th Cir.1980). The district court found that, as towards Lake City Stevedores, Inc., Lucifer had acted in bad faith by refusing to stipulate (until the day of trial) to Lake City's claim. The district court noted that Lake City's claim would prime Lucifer's mortgage under any conceivable analysis. 621 F.Supp. at 189. Absent a showing of abuse of discretion, a district court's disposition of an attorney fee claim will not be disturbed on appeal. Compania Galeana, S.A. v. M/V CARIBBEAN MARA. 565 F.2d 358 (5th Cir.1978). The district court did not explain, however, the factual basis for its determination that Lucifer acted in bad faith or with malice in opposing Lake City's claim. Without such findings, it is impossible for this Court to review the court's determination--even under the deferential "abuse of discretion" standard. We therefore must remand this issue for a more detailed factual determination by the court.[7] In re Incident Aboard D/B OCEAN KING, 758 F.2d 1063, 1072 (5th Cir.1985).
 
 
 35
 The court denied fee award requests of the other claimants, apparently finding no bad faith or malice. We find no abuse of discretion in this determination.
 
 
 36
 Prejudgment interest is usually awarded in admiralty cases. Platoro Ltd., Inc. v. Unidentified Remains, Etc., 695 F.2d 893 (5th Cir.1983). This Circuit has noted that it may only be withheld when "peculiar circumstances make its granting inequitable." Id. at 906. Inexplicably, the district court did not make provision for the award of interest.[8] Thus, we must remand to the district for an award of such interest or for a determination of "peculiar circumstances" that may make an interest award inequitable.[9] We note that this Circuit has given broad discretion to the trial judge in determining how such interest should be computed. Todd Shipyards Corp. v. Auto Transportation, S.A., 763 F.2d 745 (5th Cir.1985).
 
 Conclusion
 
 37
 We affirm the district court's conclusion that appellant Lucifer agreed to subordinate its preferred mortgage to liens arising under Article 2 of the Brussels Convention. We also affirm the district court's conclusion that the appellees' claims qualify under the provisions of Article 2. The issues of Lake City's attorney's fees and prejudgment interest are remanded to the district court for factual findings and disposition.
 
 
 
 [1]
 No party has specifically raised a choice of law issue on appeal. The district court applied United States law to determine the status of Lucifer's mortgage. 46 U.S.C. Sec. 974 clearly allows a mortgagee to waive its preferred status
 
 
 [2]
 Attorneys for Lucifer prepared and drafted the mortgage agreement documents. Lucifer can hardly claim that the inclusion of the reference to the Greek Ministerial Decision was a surprise. In addition, Lucifer did not produce evidence indicating that it only intended to be bound to some specific portion of the Greek decision. Indeed, in a subsequent clause in the mortgage, Lucifer required the owner of the vessel, Ultramar Egeo Corporation, "in particular not to do any act or thing whereby Ministerial Decision Number 54259/80 may or could be revoked." (Lucifer Exhibit No. 3 at 12.)
 
 
 [3]
 Mr. Sarlis was deposed as an expert on Greek shipping law
 
 
 [4]
 In construing the provisions of Article 2 of the Brussels Convention the district court applied the law of Greece, relying on a choice of law clause in paragraph 18 of Lucifer's mortgage. The clause provides that the "rights of property in and over the vessel" shall "be governed and construed according to the laws of the Republic of Greece...." Courts have long upheld such choice of law clauses. See generally, E. Scoles and P. Hay, Conflict of Laws, Sec. 18.1 (1982)
 
 
 [5]
 In several different contexts, the district court was faced with an issue on which Greek law had not been adequately proven. To fill in these gaps, the court looked to Louisiana law. This practice has been approved by this Circuit and by leading commentators on choice of law. In Symonette Shipyards Ltd. v. Clark, 365 F.2d 464, 468 (5th Cir.1966), we noted that "[i]n the absence of sufficient proof to establish with reasonable certainty the substance of the foreign principles of law, the modern view is that the law of the forum should be applied." Professors Scoles and Hay adopt a similar view in their treatise. E. Scoles and P. Hay, Conflict of Laws Sec. 12.19 (1982) ("[I]t is better to abandon the terminology of presumption and simply say that where foreign law is not proved the court applies ... [local] law.")
 
 
 [6]
 Since Greek law on the issue of subrogation had not been proven, the court properly looked to Louisiana law. See n. 5
 
 
 [7]
 We do not mean to discourage the award of fees in cases where the nonprevailing party has acted in bad faith throughout the course of the litigation. Nor do we mean to imply that Lake City is not entitled to an award of fees. The district judge was in the best position to gauge Lucifer's litigation posture and he obviously believed that Lucifer's behavior justified a fee award
 
 
 [8]
 We note that only Cantieri and Savoy have raised this issue on appeal
 
 
 [9]
 As the Court pointed out in Reeled Tubing, Inc. v. M/V CHAD, 794 F.2d 1026, 1028 (5th Cir.1986), peculiar circumstances "may be found where the plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by the plaintiff." Moreover, as we emphasized in Noritake, supra, the best practice for a trial court that refuses to award prejudgment interest would be for it "to detail the peculiar circumstances it has found and specifically indicate that it is denying prejudgment interest as an exercise of the discretion created by the existence of peculiar circumstances." Noritake at 729, n. 4