RYAN–WALSH, INC., et al., Plaintiffs,

v.

M/V OCEAN TRADER,
in rem, Defendant.

Civil Action No. S–94–1250.

United States District Court,
D. Maryland.

March 25, 1996.

Robert P. O'Brien, Mary Alice McNamara, Niles, Barton & Wilmer, Baltimore, MD, Melvin J. Tublin, Poles, Tublin, Patestides & Stratakis, New York City, for defendant.

John Stephen Simms, Greber & Simms, Baltimore, MD, for plaintiffs.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This admiralty action is before the Court on the parties' cross-motions for summary judgment. The issues have been exhaustively briefed, and no oral hearing is necessary. Local Rule 105.6.

### I. Factual background

The plaintiffs in this action claim that they have maritime liens against the *in rem* defendant, the M/V OCEAN TRADER, a vessel formerly known as the ANANGEL HAPPINESS.[1] The vessel's current owner, Waterville Navigation, Inc., is the claimant in this Court. The following facts are undisputed.

The plaintiff International Marine Fuels San Francisco, Inc. ("IMF–SF") provided bunkers to the ANANGEL HAPPINESS in Jakarta, Indonesia on June 13, 1990, and in Singapore on June 27, 1990. IMF–SF billed the time charterer of the ANANGEL HAPPINESS, Meridian Shipping, $86,716.42 for the fuel. Meridian did not pay IMF–SF before filing for bankruptcy in August, 1990. IMF–SF filed a claim in Meridian's bankruptcy that included the amount sought in the present action.

Plaintiff Ryan–Walsh, Inc., provided stevedoring and related services to the ANANGEL HAPPINESS in Savannah, Georgia, from April 19, 1990 through April 23, 1990. Because Ryan–Walsh and Meridian had agreed that Meridian would pay in advance for Ryan–Walsh's services, Meridian paid Ryan–Walsh $47,000 on or about April 17, 1990 as the estimated cost of the job. A surveyor representing the owners of the AN-ANGEL HAPPINESS supervised Ryan–Walsh's work at Savannah, however, and imposed additional conditions on the loading of the cargo. As a consequence, Ryan–Walsh's actual cost to load the vessel was substantial-ly more than it had anticipated, and it billed Meridian for an additional $76,640.60 for its services to the ANANGEL HAPPINESS. Meridian did not pay the invoices before it filed for bankruptcy. Ryan–Walsh claimed the value of its services in the Meridian bankruptcy.

Plaintiffs Ceres–Gulf and Intracoastal rendered services to the ANANGEL HAPPI-NESS in Houston, Texas, between March 31, 1990 and April 5, 1990. Intracoastal provided tug services to the vessel at the request of Tagship, Inc., Meridian's agent in Houston. Intracoastal sent Tagship an invoice in the amount of $2,119.54 for its services. Intracoastal was never paid. Ceres–Gulf provided stevedoring and terminal services to the AN-ANGEL HAPPINESS. Some of the services were ordered by Meridian, but most were ordered by Houston Sea Packing, a space charterer of the vessel. Ceres–Gulf sent invoices to Houston Sea Packing for $83,826.16, and to Meridian for $8,164.47, but was paid by neither entity. Ceres–Gulf sent the invoices to Houston Sea Packing approximately once a week from August 9, 1990, through December 9, 1991, and then left the matter to its attorney for collection. Despite these efforts, Houston Sea Packing did not pay Ceres–Gulf. Ceres–Gulf also sent demand letters to Meridian and filed a claim in Meridian's bankruptcy for the $8,164.47 due from Meridian.

It is also undisputed that the ANANGEL HAPPINESS left United States waters at the end of April, 1990, and did not return until May, 1994. The plaintiffs arrested her soon after she arrived in Baltimore, her first port of call in the United States.

The parties also agree that the ANAN-GEL HAPPINESS was owned by Anangel Happiness Compania Naveria, S.A., when the liens allegedly arose in 1990. In October, 1990, shortly after Meridian's bankruptcy filing, the ship was bought by Lutecia Navigation Co., Ltd., and renamed the SEA CREST. Later that same month, the vessel was sold to Sea–Shore Shipping Co., Ltd,

---

1. The vessel now known as the OCEAN TRADER was, at the time the liens allegedly arose, called the ANANGEL HAPPINESS. For a brief interim period, her name was the SEA CREST. For simplicity's sake, the vessel will generally be referred to in this opinion as the ANANGEL HAPPINESS.

and named the OCEAN TRADER. The present owner, Waterville Navigation, Inc., acquired the ship in February, 1992. It is further undisputed that Captain Harry Loudaros, the owner and director of Waterville, was also a director of both Lutecia and Sea–Shore Shipping.

Certain factual matters are disputed by the parties. The plaintiffs contend that each corporate owner of the ANANGEL HAPPINESS is related in some way to "the Angelicoussis Group," a group of corporations owned and operated by the Angelicoussis family. Indeed, the plaintiffs have gone to great lengths to identify possible links between various individuals and corporate entities involved in this case. By contrast, the claimant, Waterville, argues that it is entirely independent of the other corporate owners of the ANANGEL HAPPINESS and has no relationship whatever with any corporation connected with the Angelicoussis family.

## II. Summary judgment standards

 Summary judgment may be entered in a civil case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be appropriate even though the record contains conflicting evidence with respect to the facts, because "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, this Court must consider the facts and draw its inferences in the light most favorable to the party opposing the motion. *See Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993). The task of the Court is to decide whether or not there exist genuine issues of material fact, warranting trial. No such issue exists unless there is sufficient evidence favoring the nonmoving party to support a finding in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

## III. Laches

The claimant contends that the plaintiffs' claims to maritime liens against the vessel are barred in their entirety by the doctrine of laches. According to the claimant, it would be inequitable for this Court to enforce the claims against it because it is a *bona fide* purchaser of the vessel without notice of the liens. The plaintiffs respond that both the vessel's continuous absence from the United States and the claimant's actual or constructive knowledge of the maritime liens excuse any delay in their filing this action.

 It is well established that "laches or delay in the judicial enforcement of maritime liens will, under proper circumstances, constitute a valid defense." *The Key City*, 14 Wall. (81 U.S.) 653, 660, 20 L.Ed. 896 (1871). In *The Key City*, the Supreme Court held the laches defense inapplicable to a maritime lien claim filed three and a half years after the lien arose. The Court observed that the application of the doctrine of laches depends upon "the peculiar equitable circumstances" of each case. *Ibid.* The claimants in *The Key City*, like the claimant in the present case, contended that they were innocent purchasers of the vessel subject to the lien. The Court agreed that where a bona fide purchaser lacks notice of the lien "the defense will be held valid under shorter time, and a more rigid scrutiny of the circumstances of the delay, than when the claimant is the owner at the time the lien accrued." *Ibid.* Nevertheless, the Court held that the claimants were not entitled to the benefit of the "rule for the protection of purchasers without notice" because of the circumstances under which they acquired the vessel. 14 Wall. at 661.

 The principles set forth in *The Key City* remain the basis of laches law in the admiralty jurisprudence of this Circuit.[2] The

---

**2.** "[L]aches ... is an ancient equitable defense. Courts rarely make swift radical changes in such ancient doctrines. Innovations in laches have generally been glacial ...." Uisdean R. Vass &

Court of Appeals for the Fourth Circuit has more fully described the application of laches to a maritime lien claim against a purchaser of a ship:

"... wherever a secret lien is sought to be established upon a vessel which has passed into the possession of a bona fide owner who was ignorant of its existence, and who had no reasonable opportunity to discover it, the court will make rigid scrutiny of the circumstances of the delay, and if there has been reasonable time to enforce the lien, and the vessel has been within reach of process, the party neglecting to avail himself of it will not be allowed to enforce it to the prejudice of an innocent third party."

*Norfolk Sand & Cement Co. v. Owen,* 115 F. 778, 780 (4th Cir.1902). *See also Phelps v. The Cecelia Ann,* 199 F.2d 627 (4th Cir.1952). Later, in *Giddens v. Isbrandtsen Co.,* 355 F.2d 125 (4th Cir.1966), the Court considered the procedural aspects of the defense of laches:

"The defendant has the burden of ultimately proving inexcusable or inadequately excused delay, plus prejudice, inasmuch as laches is an affirmative defense. F.R.Civ.P. 8(c) ... [T]he court weighs the excuse, or absence of excuse, against the actual or reasonably anticipated injury."

*Giddens,* 355 F.2d at 128.[3] In the present action, therefore, the claimant Waterville must establish both that the plaintiffs unreasonably delayed filing their lien claims, and that Waterville was prejudiced by the delay.[4]

It is undisputed that the services giving rise to the alleged liens were provided to the ANANGEL HAPPINESS more than four years before the plaintiffs began this action. State statutes of limitations for analogous claims are generally a factor in determining whether there has been a sufficient delay to invoke the laches defense. *See Giddens,* 355 F.2d at 128; *The Cecelia Ann,* 199 F.2d at 628; *Rea v. An–Son Corp.,* 79 F.R.D. 25, 28 (W.D.Ok.1978). The plaintiffs have cited to the four-year limitations statutes of Georgia, Texas and California, whereas the claimant contends that the three-year statute of limitations of Maryland, the forum state, provides the proper analogy. Authority exists for both positions. *Compare Deutsche Shell Tanker v. Placid Refining,* 767 F.Supp. 762, 781 (E.D.La 1991), *aff'd,* 993 F.2d 466 (5th Cir.1993) (citing *A. Bottacchi S.A. v. Philipp Bros. Latin Amer. Corp.,* 410 F.Supp. 375, 377 (S.D.N.Y.1976)) (statute of limitations of forum), *with Asia N. America Eastbound Rate Agreement v. Pacific Champion Service Corp.,* 864 F.Supp. 195, 202 (D.D.C.1994). Regardless of which statute this Court should consider, the plaintiffs' claims were filed outside the limitations period. This fact, however, is not dispositive of the viability of the laches defense:

"It is well settled ... that laches as a defense to an admiralty suit is not to be measured by strict application of statutes of limitations ... In cases where suit has been brought after some lapse of time, the question is whether it would be inequitable, because of the delay, to enforce the claim ... This does not mean, of course, that state statutes of limitations are immaterial in determining whether laches is a bar, but it does mean that they are not conclusive, and that the determination should not be made without first consider-

---

Xia Chen, *The Admiralty Doctrine of Laches,* 53 La.L.Rev. 495, 497 (1992).

**3.** The claimant points out that *Giddens* concerns a maritime tort claim, rather than a maritime lien, and notes that the Court of Appeals acknowledged that fact in its opinion. 355 F.2d at 127–128. The Court's discussion with respect to the procedural aspects of the laches defense, however, is general in nature, and fully applicable to the present case.

**4.** Although many courts appear to treat the issues of unreasonable delay and prejudice as analytically distinct, the two factors are interdependent. The duty of the court assessing the laches defense is to determine whether, under all the circumstances, it would be inequitable to enforce the lien. If the claimant has suffered no prejudice, then a lien may be enforced even after a long and unjustified delay. *The Key City,* 14 Wall. (81 U.S.) 653, 20 L.Ed. 896 (1871) (three and a half year delay not unreasonable). By contrast, even a short delay may render enforcement of the lien inequitable where such enforcement would prejudice the rights of an innocent purchaser. *Norfolk Sand & Cement Co. v. Owen,* 115 F. 778 (4th Cir.1902) (fourteen or fifteen month delay unreasonable).

ing all the circumstances bearing on the issue."

*Czaplicki v. The Hoegh Silvercloud,* 351 U.S. 525, 533, 76 S.Ct. 946, 951, 100 L.Ed. 1387 (1956) (citations omitted).

A plaintiff's delay in commencing an *in rem* action to enforce a maritime lien may be excused if the vessel has not been in United States waters, or in the waters of another jurisdiction favorable for the enforcement of the alleged lien, since the lien arose. "If the vessel is abroad or out of the claimant's reach for a substantial portion of the time between the accrual of the lien and the attempt to enforce it, laches will not be an adequate defense." E.E. Jhirad & A. Sann, 2 *Benedict on Admiralty,* § 62 at 5–11 (7th ed. 1994) (hereinafter "Benedict"). *Accord Bermuda Exp., N.V. v. M/V LITSA,* 872 F.2d 554, 559 (3d. Cir.), *cert. denied,* 493 U.S. 819, 110 S.Ct. 73, 107 L.Ed.2d 40 (1989) ("lienors are not required to attempt to enforce their liens in foreign waters and ... the existence of a reasonable opportunity for the lienor to arrest the vessel before the purchase is an important factor in the laches analysis."). Furthermore, it is well-established in this Circuit that "[t]he diligence required [of the plaintiff] is usually measured by the opportunity of enforcement." *The Marjorie,* 151 F. 183, 185 (4th Cir.1907). *See also The Falcon,* 19 F.2d 1009, 1013 (D.Md. 1927) ("the lien will not be enforced against bona fide purchasers without notice, if earlier reasonable opportunity to enforce the lien was neglected."). Applying this principle in *Norfolk Sand & Cement Co.,* the Court of Appeals for the Fourth Circuit stated that "if ... the vessel has been within reach of process" for a reasonable time and has not been arrested, then subsequent attempts to enforce a maritime lien might be barred by laches. 115 F. at 780.

According to the plaintiffs, this Court should hold, as a general legal principle, that the laches defense is inapplicable to maritime lien claims where a vessel is abroad continuously before she is arrested. Contrary to the plaintiffs' position, however, it is clear that the question before this Court is whether, under all the circumstances, the plaintiffs' delay in filing suit was reasonable.

Under particular factual circumstances, it may be reasonable for a plaintiff to wait until a vessel reaches the United States before arresting that vessel, while under other circumstances it may not. The plaintiffs therefore cannot rely on a categorical rule that delays of *any* length must be excused while the vessel is in foreign waters. Rather, this Court must decide whether, under the undisputed facts, the plaintiffs' alleged delay was reasonable in light of the ship's absence from the United States.

The ANANGEL HAPPINESS left the United States towards the end of April, 1990, and did not return until about May 15, 1994, when she arrived in Baltimore. The plaintiffs promptly arrested her there, initiating the current action. Although the plaintiffs filed their complaint against the vessel some time after the expiration of the analogous statutes of limitations, their delay was not inordinate. *See The Key City,* 14 Wall. 653 (laches did not bar claim after three and a half years, where the owner at the time of vessel's arrest was not a bona fide purchaser.) The plaintiffs diligently tracked the ANANGEL HAPPINESS while she was beyond the reach of effective process, and arrested her at their first opportunity. Consequently, the plaintiffs have offered a reasonable excuse for their delay. This Court must therefore "weigh[ ] the excuse ... against the actual or reasonably anticipated injury" to establish whether it would be inequitable to permit or bar the plaintiffs' lien claims. *Giddens,* 355 F.2d at 128.

The claimant argues that it has "suffered prejudice in several critical ways." (Clt.'s Mem.Op.Summ.J. at 16–17.) It complains that key witnesses have either forgotten the relevant events, or died or disappeared, that it has lost its opportunity to pursue claims against third parties, and that, had it known of the liens against the vessel, such knowledge would have affected "its [purchase] decision and perhaps the purchase price." (*Id.* at 17.)

The claimant's contention that the passage of time has deprived it of evidence needed to defend itself against the plaintiffs' lien claims is meritless. The claimant's argument is based upon the alleged unavailability of reli-

able testimony from key witnesses. The plaintiffs' evidence of their lien claims is, however, largely documentary. The claimant's defenses to the lien claims, besides laches, are waiver, lack of authority to incur liens, and, with respect to IMF–SF, a claim that the liens are barred by the laws of Singapore and Indonesia. The validity of each of these defenses can be resolved from the documents contained in the record, the authenticity of which is not in dispute. Moreover, the claimant's contention that it is unable to identify and locate witnesses is belied by the fact that the plaintiffs have, through publicly available sources, managed to find individuals with knowledge of the surrounding events. *See, e.g.,* affidavits of Craig Firing, Gabriel Cserei and Donald Jones, Exhibits 1, 2 and 3 to Pltfs.' Resp. Consequently, the claimant has suffered little, if any, prejudice to its ability to defend itself. *See, e.g. Vega v. THE MALULA,* 291 F.2d 415, 419 (5th Cir.1961) (delay of five years excusable despite the death of a potential witness, because the defendant already knew of the occurrence giving rise to the suit and also knew that it had no effective defense); *Loverich v. Warner Co.,* 118 F.2d 690, 693 (3d Cir.), *cert. denied,* 313 U.S. 577, 61 S.Ct. 1104, 1105, 85 L.Ed. 1535 (1941) (delay of thirteen years caused no prejudice when the entire case turned upon medical records, which were available).

The claimant's other alleged injuries, namely its inability to proceed against third parties and its purchase of the vessel without knowledge of the liens, both depend in part upon the claimant's allegation that it was an innocent purchaser of the ANANGEL HAPPINESS. As earlier stated, in this Circuit "wherever a secret lien is sought to be established upon a vessel which has passed into the possession of a bona fide owner who was ignorant of its existence, and who had no reasonable opportunity to discover it, the court will make rigid scrutiny of the circumstances of the delay." *Norfolk Sand & Ce-*

*ment Co.,* 115 F. at 780. This legal standard recognizes that a reasonably diligent purchaser without actual knowledge of liens should pursue opportunities to discover whether circumstances exist which might give rise to a lien.

> "A balancing of the equities requires consideration not only of the bona fides of the purchaser, *i.e.,* its lack of actual knowledge of unpaid liens and its search of the ship's registry, but also of its efforts to ascertain whether, in light of the absence of any legal requirement of filing liens, there are in fact liens outstanding."

*M/V LITSA,* 872 F.2d 554, 560 (3d Cir.1989).

According to the uncontroverted deposition testimony of Captain Angelos Loudaros, who purchased the ANANGEL HAPPINESS in his capacity as director of Lutecia, the seller, Anangel Happiness Compania Naveria, S.A., was represented in connection with the sale by its employee, Captain Nicholas Vassilikos. (Loudaros Depo. at 17.) Vassilikos told Loudaros that no maritime claims existed against the ANANGEL HAPPINESS. Loudaros did not ask Vassilikos whether the ship had been under charter, and Vassilikos did not volunteer any such information. Loudaros asked his lawyer to check the register in the ship's home port, Piraeus, Greece, for claims against the vessel. He testified that he made no other attempt to ascertain whether or not claims were outstanding against the ANANGEL HAPPINESS.

These efforts on the part of Captain Loudaros do not amount to a diligent effort to identify possible sources of maritime liens against the ANANGEL HAPPINESS prior to her purchase.[5] They stand in stark contrast to efforts held sufficient to establish the *bona fide* lack of knowledge of an innocent purchaser. In *Tagaropulos, S.A. v. S.S. SANTA PAULA,* 502 F.2d 1171 (9th Cir. 1974), for example, the seller of the ship assured the purchaser, both orally and in writing, that no undisclosed claims existed against the vessel. Exercising reasonable

---

5. The plaintiffs failed to record their maritime liens. Although "the ability to have filed a lien is a consideration that cannot be completely ignored in the relevant balancing," it is generally not regarded as compelling because CIMLA does not require that maritime liens be recorded. *See*

*M/V LITSA,* 872 F.2d at 561 ("there is no legal requirement for [filing liens] and ... no evidence of an industry custom to do so.") Consequently, although the plaintiffs' failure to record their liens is a factor to be considered, it is not dispositive.

prudence on its own behalf, the purchaser nonetheless checked the ship's log and her home port registry for liens, discovered that repairs had been made, and ascertained from the shipyards that bills for those repairs were still outstanding and might give rise to maritime liens. Sixteen months after the purchase, a chandler, whose claim the purchaser had not discovered, sued to enforce an alleged maritime lien against the vessel. The lien action was barred by laches, in part because the purchaser was unaware of the claim even though he had "made every effort to unearth all claims against the ship." 502 F.2d at 1172.

There is undisputed evidence that Captain Loudaros could have ascertained from even the most cursory inquiries that there might be outstanding liens against the vessel, both because of the publicity surrounding Meridian's bankruptcy and because the vessel used the same chartering and insurance agent both before and after it was bought by Lutecia. The parties agree that at the times the liens arose, the vessel was owned by Anangel Happiness Compania Naveria, S.A.[6] In October, 1990, the ANANGEL HAPPINESS was sold to Lutecia Navigation Co., Ltd. and renamed the SEA CREST. Later that same month, Lutecia sold the ship to Sea–Shore Shipping Co., Ltd. Finally, in 1992, Sea–Shore sold the ship, now called the OCEAN TRADER, to Waterville, the claimant in this action.

It is also undisputed that Captain Angelos Loudaros, the owner and a director of Waterville, was also a director of Sea–Shore and of Lutecia, and that he was instrumental in each company's purchase of the vessel. Under these circumstances, Waterville could not obtain the status of a *bona fide* purchaser of the ship by virtue of the transfers of title from Lutecia to Sea–Shore and from Sea–Shore to Waterville. While conceding the close relationship between Lutecia, Sea–Shore and Waterville, however, the claimant argues that Lutecia was entirely independent of Anangel Happiness Compania Naveria, S.A., and that Lutecia did not acquire knowledge of the liens when it bought the ANANGEL HAPPINESS in 1990.

Meridian filed for bankruptcy in August, 1990. From September, 1990, Anangel Happiness Compania Naveria, S.A., pursued claims in the Meridian bankruptcy proceedings through two lawyers, Nicholas Bratsafolis and John Ward. (Bratsafolis Depo. at 8, 23.) Mr. Bratsafolis was retained by, and reported to, Peter Kohler and John Angelicoussis, employees of Agelef Shipping Co. (London), Ltd. ("Agelef") (Bratsafolis Depo. at 20, 24). Agelef was the chartering and insurance agent for the ANANGEL HAPPINESS at the time the liens allegedly arose. (*Id.* at 5). Both AnAngel Happiness Compania Naveria, S.A. and Agelef were therefore aware in September, 1990, that Meridian had gone into bankruptcy. The ANANGEL HAPPINESS was sold to Lutecia in October, 1990.

Anangel Happiness Compania Naveria, S.A. and Agelef continued to participate in the Meridian bankruptcy through Mr. Ward and Mr. Bratsafolis. Each of the plaintiffs' claims in the present action, except for Ceres–Gulf's claims against Houston Sea Packing, is listed on the schedule of Meridian's debts. The record also contains a letter from Mr. Ward to another attorney, Michael Schwartz, discussing the claims in the Meridian bankruptcy as follows:

> "[M]any of the claims stated are claims which would give rise to maritime liens against specific ships. I have identified each of those claims as they might apply to the M/V ANANGEL HAPPINESS ... and have written to the owners ... asking what, if anything, they have paid against those specific claims."

(Letter dated November 23, 1992, Pltfs' Mot. Summ.J., Exh. 16.) In the letter, Mr. Ward identified each of the plaintiffs' claims in the present case as the source of a possible

---

**6.** Although the claimant argued strenuously at pages 5 through 7 of its Memorandum in Opposition to the Plaintiffs' Summary Judgment Motion that the ANANGEL HAPPINESS was owned by an entity called Anangel Ship Holdings Group Limited, it no longer makes such a factual asser-

tion. In its more recent pleadings the claimant states, instead, that Anangel Compania Naviera, S.A. owned the vessel in 1990. *See, e.g.*, Claimant's Reply to Plaintiffs' Further Submission at 4 and 8.

maritime lien against the ANANGEL HAPPINESS.[7]

The record reveals that Agelef's connection with the vessel continued from 1990 until 1994. Captain Loudaros' uncontroverted deposition testimony establishes that Agelef remained the chartering and insurance agent for the vessel after it was sold to Lutecia in 1990. (Stipulated deposition testimony of Captain Loudaros at 33, lines 8–12, and at 15). Furthermore, Agelef acted in that capacity after 1990. Loudaros testified that Agelef acted as chartering agent for the OCEAN TRADER in 1992, and that after 1992 Agelef acted as Waterville's agent for "certain items." (*Id.* at 14, 15.) When the vessel was arrested in connection with this action in 1994, Captain Loudaros immediately reported the arrest to Mr. Peters at Agelef. (*Id.* at 31.) Agelef instructed Mr. Bratsafolis to arrange for security to release the vessel from arrest. (Bratsafolis Depo. at 33–34.)

It is evident from these undisputed facts that even if Captain Loudaros lacked actual knowledge that liens might exist against the ANANGEL HAPPINESS, the most cursory inquiries into the vessel's circumstances would have alerted him to the possibility of outstanding liens. Furthermore, ample opportunity existed after the sale to Lutecia for the vessel's various corporate owners to learn of the plaintiffs' claims. In light of the vessel's prolonged absence from the United States, the plaintiffs' prompt arrest when she arrived in Baltimore and their other efforts to enforce the liens, the claimant has failed, as a matter of law, to adduce sufficient evidence of prejudice to support its laches defense. The claimant has not suffered the loss of any evidence necessary for its defense of the plaintiffs' lien claims. The claimant had ample opportunity to discover the existence of the liens, but failed to make even cursory efforts to do so. Under these circumstances, the alleged prejudice to the claimant does not, as a matter of law, make the plaintiffs' delay in filing suit unreasonable, and the claimant's laches defense must fail.[8]

## IV. The maritime liens
### a. IMF–SF

■ IMF–SF contends that its bunkering services rendered in Jakarta, Indonesia on June 13, 1990, and in Singapore on June 27, 1990, gave rise to maritime liens against the ANANGEL HAPPINESS. It is undisputed that IMF–SF supplied the vessel with necessaries on those dates, at Meridian's request, and that IMF–SF's invoices have not been paid. The claimant contends, however, that the laws of Indonesia and Singapore, respectively, determine whether maritime liens arose from IMF–SF's provision of services. According to the claimant, neither Indonesian nor Singaporean law would permit the formation of a maritime lien under the circumstances alleged by the plaintiffs.

In framing its choice of law issue, the claimant has utterly ignored the terms of the agreements between Meridian and IMF–SF with respect to the provision of fuel to the ANANGEL HAPPINESS. On June 8, 1990, before delivering bunkers to the ANANGEL HAPPINESS in Jakarta, IMF–SF sent Meridian a "Proforma Invoice" by telex, which stated, in part, as follows:

> "Product is sold to the vessel and its owner(s) and the agreement to forward invoices to the paying authority shall in no way alter or change the vessel's ultimate responsibility for the debt incurred in this contractual transaction . . .

**7.** The claimants argue that Anangel Compania Naviera, S.A., as the owner of the ANANGEL HAPPINESS, would have been informed of the liens and that the information is therefore irrelevant with respect to Waterville or its predecessor companies. The claimant overlooks the fact that the information would have been communicated to Agelef, the chartering and insurance agent for the vessel both before and after its sale.

**8.** The plaintiffs have attempted in their pleadings to establish that relationships existed between many of the corporations and individuals involved with the ANANGEL HAPPINESS between 1990 and 1994. Because the facts relating to Agelef's involvement with the vessel are undisputed and are also sufficient, as a matter of law, to show that Waterville and its predecessors failed to avail themselves of reasonable opportunities to discover the alleged liens, this Court will not comment upon the remainder of the plaintiffs' evidence that Waterville is not a *bona fide* purchaser of the vessel.

"All terms of this agreement are to be governed by the law of the United States of America.... All other terms and conditions to be governed by our General Conditions of Sale."

(June 8, 1990 Telex from IMF–SF to Meridian, Pltfs.' Exh. 7 to Mot.Summ.J.) On June 13, IMF–SF delivered bunkers to the AN-ANGEL HAPPINESS. On June 29, IMF–SF sent Meridian its invoice for $15,150. The final invoice referred explicitly to the "Proforma Invoice" of June 8, which had incorporated into the parties' agreement IMF–SF's General Conditions of Sale, and also set out those Conditions on the back of the invoice. The Conditions provide, *inter alia*, that "all sales shall be made on the credit of the receiving vessel and the ordering entity placing order with Seller, and the amount due shall become a maritime lien against the vessel immediately upon each delivery." (IMF–SF's General Conditions of Sale, ¶ 3, Pltfs.' Exh. 7 to Mot.Summ.J.)

With respect to the delivery of bunkers to the ANANGEL HAPPINESS in Singapore two weeks later, the record of the agreement between the parties is less complete. Although the final invoice which IMF–SF sent to Meridian on July 2, 1990 refers to "Our Proforma Invoice of 6/26/90," the proforma invoice itself is not part of the record before the Court. The July 2 invoice, however, incorporates IMF–SF's General Conditions of Sale, including the choice of American law and the arrangement for maritime liens, into the agreement between the parties.

Consequently, to the extent that the parties are entitled to make their own determination with respect to choice of law, IMF–SF may assert liens against the vessel, regardless of the laws of Singapore or Indonesia. Under the circumstances of the present case, it seems beyond dispute that the parties' choice of law provision should be enforced. In *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), and later in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113

L.Ed.2d 622 (1991), the Supreme Court required the enforcement of forum selection clauses in admiralty contracts.[9] The Court held in *The Bremen* that, "absent some compelling and countervailing reason," a negotiated forum-selection clause "should be honored by the parties and enforced by the courts." 407 U.S. at 12, 92 S.Ct. at 1914. In *Carnival Cruise Lines,* the Court extended its decision in *The Bremen* to hold enforceable a forum-selection clause contained in a standard form contract of passage.

It is clear from these decisions that the agreements of private parties, whether freely negotiated or not, are ordinarily to be given full effect by federal courts. Accordingly, choice of law and choice of forum provisions in admiralty contracts have generally been held to be enforceable. *See, e.g., Sembawang Shipyard, Ltd. v. Charger, Inc.,* 955 F.2d 983, 986 (5th Cir.1992); *Cantieri Navali Riuniti v. M/V Skyptron,* 802 F.2d 160, 163 n. 4 (5th Cir.1986); *Roberson v. Norwegian Cruise Line,* 897 F.Supp. 1285 (C.D.Cal. 1995); *Melnik v. Cunard Line, Ltd.,* 875 F.Supp. 103 (N.D.N.Y.1994); *Hernandez v. Koninklijke Nederlandsche Stoomboot Maatschappij N.V.,* 252 F.Supp. 652 (S.D.N.Y. 1965), and cases cited therein. The claimant has not alleged in this case that enforcement of the choice of law provision would be fundamentally unfair, or otherwise opprobrious. Consequently, in light of the terms of the bunkering agreement between IMF–SF and Meridian, IMF–SF's provision of bunkers to the ANANGEL HAPPINESS gave rise under American law to maritime liens in favor of IMF–SF.

### b. Ryan–Walsh

The parties agree that Ryan–Walsh, a stevedoring company, provided necessaries to the ANANGEL HAPPINESS at Savannah, Georgia, from April 19th to April 23, 1990 at Meridian's request. The claimant argues that the undisputed facts show, as a matter of law, that Ryan–Walsh waived its right to

---

9. Although the Supreme Court cases involve forum selection clauses, rather than choice of law provisions, they are nonetheless highly persuasive authority with respect to the issue of the parties' right to choose the law governing their

own agreement. *See Sembawang Shipyard, Ltd. v. Charger, Inc.,* 955 F.2d 983, 986 (5th Cir.1992) ("That *Carnival Cruise Lines* [and] *The Bremen* concern forum-selection clauses instead of choice-of-law clauses makes no difference.")

assert a maritime lien with respect to its provision of these services.

■ The Commercial Instruments and Maritime Liens Act expressly provides that a supplier of necessaries may waive a maritime lien created under its provisions: "This chapter does not prevent a ... lien holder from waiving ... at any time by agreement or otherwise the lien holder's right to a lien...." 46 U.S.C. § 31305. Nevertheless, because 46 U.S.C. § 31342(a)(3) provides that an entity claiming a maritime lien "is not required to allege or prove in the action that credit is given to the vessel," courts have held that "the presumption is very strong that those who furnish marine necessaries look to the credit of the vessel, not merely to the owner or charterer." *S.E.L. Maduro (Fla.), Inc. v. M/V "ANTONIO DE GASTE-NATA"*, 1990 A.M.C. 2097, 2101, 1990 WL 172688 (S.D.Fla.1990). *See also Bermuda Express, N.V. v. M/V LITSA*, 872 F.2d 554, 562 n. 7 (3d Cir.1989); *Equilease Corp. v. M/V Sampson*, 793 F.2d 598 (5th Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986); *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743 (5th Cir. 1985); *Farrell Ocean Services, Inc. v. United States*, 681 F.2d 91 (1st Cir.1982); *Newport News Shipbuilding & Dry Dock Co. v. S.S. Independence*, 872 F.Supp. 262, 267–268 (E.D.Va.1994). *See generally* Benedict, § 61. The Court of Appeals for the Fifth Circuit concisely stated the applicable law of waiver as follows:

> "Thus, under [CIMLA], a presumption arises that one furnishing supplies to a vessel acquires a maritime lien, and the party attacking this presumption has the burden of establishing that the personal credit of the owner or charterer was solely relied upon.... To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien."

*Equilease*, 793 F.2d at 605–06 (citations omitted).

Although the Court of Appeals for the Fourth Circuit has not set forth with any clarity the law governing the waiver of maritime liens, it appears to have adopted the presumption against waiver. The Court re- cently held that a supplier did not waive its maritime lien when it arranged for a third party to guarantee a charterer's payments for the supplies. *South Carolina State Ports Authority v. M/V Tyson Lykes*, 67 F.3d 59, 62 (4th Cir.1995) (approving the district court's finding that " 'additional security was taken by the [supplier] without in any way relinquishing its right to lien the vessels.' ") Relying on its decision in *Jeffrey v. Henderson Bros.*, 193 F.2d 589 (4th Cir. 1951), which had sustained a supplier's maritime lien although there was evidence that the supplier relied on the credit of both the owner and the ship, the Court held that "by taking the guarantee ... the Authority did not waive its lien for such necessaries." 67 F.3d at 62.

According to one court addressing a claimant's argument that a maritime lien had been waived, "[e]ven under the best of circumstances, this position is difficult to sustain." *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1209 (5th Cir.1978). In the present case, the claimant contends that Ryan–Walsh's agreements for payment with Meridian amount to a waiver of maritime liens against the ANANGEL HAPPINESS. The parties agree that before Ryan–Walsh rendered its services in April, 1990, it had identified Meridian as a "slow pay." Indeed, on March 6, 1990, Ryan–Walsh notified Meridian that "until all past due accounts are paid future business with Meridian Ship will be on a cash basis." (Clt.'s Exh. 3 to Mot. Summ.J.) In accordance with its "cash only" policy, Ryan–Walsh estimated the cost of its proposed services to the ANANGEL HAPPINESS and requested payment of the entire amount in advance. (Clt.'s Exh. 4 to Mot.Summ.J.) Meridian paid the estimated fee, but, as events transpired, Ryan–Walsh had underestimated the job by more than $76,000. Meridian never paid the balance of its debt to Ryan–Walsh. After Meridian's bankruptcy, Ryan–Walsh did not immediately seek payment from the vessel's owners. Ryan–Walsh now asserts a maritime lien in this action for the outstanding $76,640.60.

■ According to the claimant, the facts show, as a matter of law, that "Ryan–Walsh waived its maritime lien by foregoing the

credit of the vessel in its sole reliance on and pursuit of the charterer." (Clt.'s Mot. Summ.J. at 30.) Although it is clear that Ryan–Walsh made every effort to ensure that Meridian would pay for its services to the ANANGEL HAPPINESS, it is also clear, contrary to the claimant's position, that relying on an owner's or charterer's credit does not, standing alone, amount to the waiver of a maritime lien. Indeed, the situation is closely analogous to that addressed by the Fourth Circuit in *South Carolina State Ports Authority*, where the claimant argued, unsuccessfully, that a supplier's procurement of a guarantee of the charterer's payment amounted to a waiver of its maritime lien. 67 F.3d 59.

██ The case principally relied on by the claimant in this regard does not support its position. In *Equilease Corp. v. M/V Sampson*, 793 F.2d 598 (5th Cir.1986), there was direct evidence, in the form of express testimony from the supplier, that the supplier had relied exclusively upon the credit of the vessel's owner, its parent company, and the charterer. No such evidence exists in this case. Indeed, the record is entirely devoid of evidence that Ryan–Walsh intended to give up its right to a lien against the ANANGEL HAPPINESS by relying *exclusively* on Meridian's credit. Consequently, this Court holds, as a matter of law, that Ryan–Walsh did not waive its maritime lien.

### c. *Ceres–Gulf and Intracoastal*

Ceres–Gulf ("Ceres") claims $91,990.63 in this action, for stevedoring services rendered to the ANANGEL HAPPINESS between March 31 and April 5, 1990. Intracoastal provided tug services to the vessel during the same time period, and claims $2,119.54 here. The claimant does not dispute that Ceres and Intracoastal provided such necessaries to the vessel, but argues that the bulk of the services do not give rise to a maritime lien because they were not ordered by a "person authorized by the owner," as required by 46 U.S.C. § 31341.[10]

Ceres–Gulf claims over $80,000 in this action based on services ordered by Houston Sea Packing. The claimant has taken the position that nothing is known about Houston Sea Packing or its relationship, if any, to Meridian, and that to the extent that Ceres–Gulf's claims are "attributable to the mysterious Houston Sea Packing," they should be denied. (Clt.'s Mot.Summ.J. at 28.) The claimant also contends that Intracoastal's services were ordered by a company called Tagship, rather than by Meridian. (*See id.* at 10.) The claimant describes Tagship as "an entity which Intra–Coastal knows next to nothing about and merely assumed was acting for Meridian." (*Id.* at 28). According to the claimant, "there is absolutely no shred of evidence that [Houston Sea Packing and Tagship] were authorized by the owner or charterer to order supplies for the vessels." (*Id.* at 29).

██ Contrary to the claimant's contentions, the record contains substantial, uncontroverted evidence involving the respective relationships between Houston Sea Packing and Meridian, and between Tagship and Meridian. Some of that evidence consists of the affidavits of Craig Firing, Gabriel Cserei and Donald Jones.[11] Both Firing and Cserei testified that Tagship was "Meridian's authorized steamship agent at Houston." (Firing Affid. ¶ 4; Cserei Affid. at ¶ 4.) Indeed, Tagship's Record of Services provided to the ANANGEL HAPPINESS at Houston, which was signed by her master, identifies Tagship as "Tagship, Inc., as agents to D/Owners Meridian Ship, Inc., Baltimore." (Exh. 4. to Pltfs' Resp.)[12] As an agent appointed by the

---

10. CIMLA includes among the list of persons "presumed to have authority to procure necessaries for a vessel ... an officer or agent appointed by— ... a charterer." 46 U.S.C. § 31341(a)(4)(B).

11. Mr. Firing was Executive Vice President and an operating officer of Meridian. Captain Cserei was Port Captain for Meridian until Meridian filed for bankruptcy. His job "was to supervise the calls of Meridian-chartered vessels, the load-ing of cargo onto those vessels, and the supply of those vessels with goods and services ..." (Cserei Affid., ¶ 2, Exh. 2 to Pltfs' Resp.) Donald Jones was in 1990, and is now, President of Houston Sea Packing.

12. The claimant protests that Intracoastal failed to pursue its claims against Tagship. The claimant overlooks the fact that as an agent of its disclosed principal, Meridian, Tagship itself would not be liable to Intracoastal. Intracoastal

charterer, Tagship plainly had authority under 46 U.S.C. § 31341 to procure necessaries for the ANANGEL HAPPINESS.

 According to the affidavits of Donald Jones and Gabriel Cserei, Houston Sea Packing chartered space on the ANANGEL HAPPINESS from her time charterer, Meridian, to transport modular units from Houston to St. Croix. One week before the units were due to be loaded in Houston, Mr. Jones travelled to Mobile, Alabama, where the ANANGEL HAPPINESS was calling, to discuss the loading operations with the vessel's master and with Captain Cserei, Meridian's port captain. The parties agreed that it would be Houston Sea Packing's obligation to procure stevedoring services for the loading. When the units were actually loaded in Houston, the stevedoring operations were supervised by Captain Cserei for Meridian and by Captain Harry Loudaros and a surveyor for the owners.[13]

In light of these undisputed facts, it is evident that Houston Sea Packing had authority to procure necessaries for the ANANGEL HAPPINESS. Houston Sea Packing was not only a charterer in its own right; Meridian also authorized it to order Ceres–Gulf's services, and both Meridian and the vessel's owners supervised the loading of Houston Sea Packing's cargo.[14]

As a matter of law, therefore, Houston Sea Packing and Tagship were persons with authority to procure necessaries for the ANANGEL HAPPINESS under 46 U.S.C. § 31341.

___

filed a claim in the Meridian bankruptcy for the amount that it seeks in this action.

**13.** The plaintiffs allege that Captain Harry Loudaros is related to Captain Angelos Loudaros, the director of Lutecia, Sea–Shore and Waterville. The nature of the relationship, if any, is not apparent from the record. It is clear, though, that Captain Harry Loudaros acted for Anangel Shipping, U.S.A. The surveyor who supervised Ceres–Gulf's work in Houston sent the survey report to Captain Loudaros of the ANANGEL HAPPINESS, at Anangel Shipping's address. (Pltfs.' Mot.Summ.J., Exh. 4.)

**14.** The claimant suggests that Ceres–Gulf is not entitled to assert its claims against Houston Sea

## V. Conclusion

The undisputed facts demonstrate that each of the claimant's defenses to the plaintiffs' lien claims fails as a matter of law. Consequently, by a separate order, this Court will *grant* the plaintiffs' motion for summary judgment, *deny* the claimant's motion for summary judgment, and enter judgment in favor of the plaintiffs and against the OCEAN TRADER.

 The plaintiffs asked this Court to award prejudgment interest at a rate of 5.5% from the time that their invoices became payable. Perhaps because of its litigation position, the claimant has not addressed the issue of prejudgment interest. An award of prejudgment interest is committed to the discretion of this Court, but is "almost automatic unless the manner in which the claim has been prosecuted is properly subject to criticism." *W.R. Grace & Co. v. S.C. Loveland Co.*, 1990 A.M.C. 2515, 2520, 1990 WL 13014 (4th Cir.1990). This Court's disposition of the claimant's laches defense, which was directed against the plaintiffs' conduct in enforcing its liens, demonstrates that the claimant has no basis for criticizing the plaintiffs' conduct in the litigation. Consequently, this Court will exercise its discretion to permit an award of prejudgment interest to the plaintiffs, and will *not* entertain briefing from the claimant directed to that issue.

Nevertheless, the claimant should be given the opportunity to address the rate at which prejudgment interest should be assessed. The Court directs the parties to use their best efforts to reach agreement on this issue, and to inform the Court within fifteen days

___

Packing because it neglected to claim those amounts in Meridian's bankruptcy. The claimant apparently has not distinguished between Ceres–Gulf's *in rem* and *in personam* claims. Meridian authorized Houston Sea Packing to provide services to the ANANGEL HAPPINESS, giving rise to a maritime lien against the vessel. *See* 46 U.S.C. § 31341. Nevertheless, Meridian's authorization would not give Houston Sea Packing an *in personam* claim against Meridian. Consequently, this Court rejects the claimant's suggestion that some sinister implication is to be drawn from Ceres' failure to include in its claim in the Meridian bankruptcy the amount of its claims in this action *in rem* which are attributable to Houston Sea Packing.

of the date hereof whether they have agreed upon a rate of prejudgment interest, and upon a total amount of prejudgment interest due to the plaintiffs. In the event that the parties fail to reach agreement, each party shall, by Friday, April 12, 1996, file in this Court a brief, not exceeding four pages in length, setting forth the proposed rate of prejudgment interest, the reasons therefor, and calculations of the amounts due each plaintiff under each party's proposed method of calculation. This Court will not entertain any responsive briefs.

When the proper amount of prejudgment interest has been calculated, this Court will issue an order entering summary judgment in this case.