United States Court of Appeals,

Fifth Circuit.

No. 95-40221.

GALVESTON COUNTY NAVIGATION DISTRICT NO. 1, Plaintiff-Appellee,

v.

HOPSON TOWING COMPANY, INC., Defendant,

and

M/V MISS SANDY, its engines, tackle, equipment, machinery, gear, furniture, apparel, appurtenances, etc.; Hopson Transportation, Inc.; Hopson Marine Transportation, Inc., Defendants-Appellants.

Aug. 27, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before GARWOOD, EMILIO M. GARZA and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

The M/V Miss Sandy, a tug boat owned and operated by defendants-appellants Hopson Transportation, Inc., et al. (defendants), was pushing two barges when one of the barges allided with a drawbridge owned and operated by plaintiff-appellee Galveston County Navigation District No. 1 (plaintiff). Following a bench trial, the district court found in favor of the plaintiff. Moreover, the district court ordered the defendants to pay plaintiff attorneys' fees totaling $20,000. The defendants appeal, challenging only this award of attorneys' fees.

**Facts and Proceedings Below**

On March 11, 1993, one of two barges being pushed by the defendants' tug boat, the M/V Miss Sandy, allided with the southeast fender system of the Herbert Schmidt drawbridge.[1] This drawbridge is owned, maintained, and operated by the plaintiff. The resulting damages were surveyed, and although the parties agreed to the amount of damages, they disagreed regarding the

---

[1]The Herbert Schmidt drawbridge links Galveston Island with Pelican Island at the western end of the Galveston Ship Channel.

1

apportionment of fault relating to this accident. Accordingly, the plaintiff filed this suit in the district court below against Hopson Transportation, Inc., which owned and operated the M/V Miss Sandy on the date of the allision, against Hopson Marine Transportation, Inc., which owned the M/V Miss Sandy at the time this suit was filed, and also against the M/V Miss Sandy, *in rem.*

Prior to trial, the plaintiff responded to the defendants' discovery requests by presenting its two bridge tenders for deposition. The plaintiff likewise took the depositions of several persons, including Douglas Ebert, the mate of the M/V Miss Sandy at the time of the accident, Ricky Borres, the captain of the M/V Miss Sandy at the time of the accident, and Joseph Hopson, the President of Hopson Transportation, Inc. and Hopson Marine Transportation, Inc. Additionally, the defendants responded to plaintiff's requests for admissions, written interrogatories, and requests for production.

At trial, the plaintiff put on evidence regarding the standard operating procedures employed to insure that the drawbridge is fully open and in a fixed position in sufficient time for a vessel to pass through the bridge without incident. The plaintiff adduced evidence that the drawbridge complied with these procedures, but that the M/V Miss Sandy failed to (1) properly align its tows, (2) adequately anticipate current and wind conditions, (3) maintain proper speed, and (4) adequately communicate with the drawbridge during its approach.

In response, the defendants adduced evidence at trial that the drawbridge did not respond to the M/V Miss Sandy's initial attempts at radio contact—on two different channels—for three to five minutes. Only after the M/V Miss Sandy sounded a whistle signal did the drawbridgge would be opened when the M/V Miss Sandy drew a bit closer. The parties offered conflicting evidence concerning the location of the M/V Miss Sandy when the bridge began to open. The defendants offered testimony that the M/V Miss Sandy had to be stopped because the bridge was not sufficiently opened, and Mate Ebert was concerned that his tow would allide with the drawbridge itself. Moreover, testimony was presented that subsequently, after the bridge had further opened, the tug boat, finding itself unable to turn around safely in the channel after coming to a stop, elected to proceed forward through the drawbridge. Finally, the defendants offered testimony that the

drawbridge's failure to open timely forced the tug boat to lose its maneuverability close to the bridge, which in turn contributed to its barge's allision with the southeast fender system of the bridge.[2] Therefore, the parties disputed at trial whether the bridge had been timely raised and whether delay in raising, if any, contributed to the allision.

The district court found that the plaintiff carried its burden of proving reasonable operation of the bridge, and that no act or omission on the part of the plaintiff caused or contributed to causing the allision. The court further found that the M/V Miss Sandy was guilty of causative negligence in the following particulars: (1) failing to undertake adequate communications with the bridge on its approach, (2) failing to maintain proper speed and to maintain steerage way in its approach, (3) failing to back away or take evasive measures once a problem with the bridge was apprehended, and (4) failing to adequately anticipate current and wind conditions during its approach. The court also found that the M/V Miss Sandy's owners failed to give her captain adequate notice of potential problems with the bridge approach. Therefore, the court held that the defendants were solely and one hundred percent liable for the stipulated damages (with prejudgment interest) arising from this accident.[3]

Furthermore, the district court held that the plaintiff was entitled to recover $20,000 in reasonable and necessary attorneys' fees.[4] In so holding, the court asserted that:

---

[2]In presenting this defense, the defendants relied on the Bridge Act of 1906, 33 U.S.C. § 494, which requires that "[T]he draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal ..." Similarly, 33 C.F.R. § 117.5 was cited by the defendants in that it mandates the opening of drawbridges "promptly and fully for the passage of vessels when a request to open is given ..."

[3]Judgment was entered against Hopson Transportation, Inc. and Hopson Marine Transportation, Inc. *in personam,* and against the M/V Miss Sandy *in rem,* jointly and severally, in the sum of $80,570.53. This sum was comprised of the following: (1) $56,152.20 for damages, $4,418.33 for prejudgment interest, and $20,000 for attorneys' fees; (2) interest thereon at the rate of five percent per annum from the date of the judgment until paid; and (3) court costs totaling $211.60.

[4]The district court found support for this award of attorneys' fees in an Eighth Circuit opinion that the district court erroneously cited as a decision from this Circuit, *E.I. DuPont de Nemours & Co. v. Riverway Harbor Service St. Louis, Inc.,* 639 F.2d 404 (8th Cir.1981). That case, which we have never cited, involved an action for indemnity based on the active-passive negligence doctrine; we expressly disavowed this doctrine in *Loose v. Offshore Navigation, Inc.,* 670 F.2d 493, 502 (5th Cir.1982). Citing *Riverway Harbor Service,* the district court observed that "[T]his

"[T]he defense offered by the Defendants in regard to the claim of this case borders on the frivolous, is unsupported factually from a common sense standpoint, is contradictory factually even as regards its own merits, and is utterly incredible to the Court in any respect ... It is necessary to award Plaintiff its attorney's fees in order to make Plaintiff whole."

Citing *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967), the district court concluded that the circumstances of the present case justified the award of attorneys' fees to an "admiralty plaintiff" as an item of compensatory damages. Citing *Vaughan v. Atkinson,* 369 U.S. 527, 530-31, 82 S.Ct. 997, 999-1000, 8 L.Ed.2d 88 (1962), the court held that:

"By failing to pay for the damages it obviously caused in an amount that Defendants stipulated and agreed was reasonable, the Defendants have not acted in an equitable manner in the equity action before this Court and have required Plaintiff to incur significant attorney's fees in order to recover the damages relating to its traffic fender system that were plainly owed to Plaintiff. Defendants' default herein was willful and persistent." (internal citations omitted).

We must note, however, that the district court prefaced its finding that the defense "border[ed] on the frivolous" with *praise* for defense counsel's conduct: "In this case, notwithstanding the fine efforts of counsel for defendant, which the Court only commends and finds no impropriety with in any respect whatsoever ..." Moreover, at the close of its remarks regarding the award of attorneys' fees, the court addressed counsel for both sides and offered additional praise:

"All right. Well, again, I would like to thank each of you for your thoughtfulness and your assistance throughout the resolution of the case. I would like to commend each of the parties again, notwithstanding the mechanics of the resolution of the case, for a superb job in the preparation of and presentation of the case. I'm very pleased that each of the attorneys here is an officer of this court and I look forward to many opportunities to work with each of you in the future."

The district court entered judgment on February 28, 1995. The defendants appeal only that portion of the judgment awarding the plaintiff attorneys' fees.

## Discussion

Pursuant to the "American Rule," "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Service Co. v.*

---

Circuit has expressly held that trial courts sitting in admiralty have power to impose attorney's fees."

4

*Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *see also Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995, 1011 (5th Cir.1984) ("The general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party"). Generally, absent statute or enforceable contract, litigants must pay their own attorneys' fees. *Id.* at 255-57, 95 S.Ct. at 1621.[5]

There are, of course, exceptions to this general rule. The Supreme Court also recognized in *Alyeska* that the federal courts have the inherent power to award attorneys' fees in particular situations, unless forbidden by Congress. *Id.* at 258-59, 95 S.Ct. at 1622. Of the several examples of such situations given by the Court in *Alyeska,* only one might even be arguably relevant in the present case: "[A] court may assess attorneys' fees ... when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons....' " *Id.* (quoting *F.D. Rich Co., Inc. v. United States for Use of Industrial Lumber Co., Inc.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (citing *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962))).[6]

---

[5]We note that 28 U.S.C. § 1923(a) authorizes, *inter alia,* the recovery of "[a]ttorney's and proctor's docket fees" of "$20 on trial or final hearing ... in civil, criminal, or admiralty cases, except that in cases of admiralty and maritime jurisdiction where the libellant recovers less than $50, the proctor's docket fee shall be $10; $20 in admiralty appeals involving not over $1,000; $50 in admiralty appeals involving not over $5,000; $100 in admiralty appeals involving more than $5,000" and "$2.50 for each deposition admitted in evidence." Clearly, this is not the statutory provision underpinning the award of attorneys' fees presently at issue.

[6]Additionally, 28 U.S.C. § 1927 provides that:

> "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

In *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the Supreme Court held that this and similar statutory provisions did not entirely displace the inherent power of the courts to impose sanctions for certain bad faith conduct. *Id.* at 46-48, 111 S.Ct. at 2134. In reaching this conclusion, the Court referred expressly to the inherent power of the federal courts to assess attorneys' fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46, 111 S.Ct. at 2133 (quoting *Alyeska,* 421 U.S. at 258-59, 95 S.Ct. at 1622-23). The Court observed in *Chambers* that, while the sanctioning scheme of 28 U.S.C. § 1927 and other similar statutes "reaches only certain individuals or conduct, the inherent power extends to

The evolution of this bad faith exception to the American Rule in the context of admiralty law began with *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *see also Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496, 1502 (5th Cir.1995) (en banc) ("In fact, *Vaughan* is often cited as a foundational case for this "bad-faith' exception to the American Rule"), *cert. denied,* --- U.S. ----, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996).[7] *Vaughan* involved a seaman's claim for maintenance and cure, and for damages resulting from the respondents' failure to pay maintenance and cure.[8] The Court observed that:

> "In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one." *Id.* at 530-31, 82 S.Ct. at 999-1000 (footnote omitted).

Accordingly, the Supreme Court allowed the seaman to recover his reasonable attorneys' fees. *Id.*

In ruling that seaman Vaughan was entitled to recover (1) the maintenance and cure owed to

---

a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices." 501 U.S. at 46, 111 S.Ct. at 2134.

[7]We note appellants' observation in the present case that the bad faith exception to the American rule arose in *Vaughan,* a maintenance and cure case. Appellants contend that the purpose behind this exception employed in the maintenance and cure context limits its applicability to that particular aspect of general maritime law. Appellants argue that seamen are treated as wards of the admiralty court, and therefore receive special protections not afforded to other admiralty litigants. We have not limited application of the bad faith exception to maintenance and cure cases, but have extended it to other contexts within general maritime law. *See Cantieri Navali Riuniti v. M/V Skyptron,* 802 F.2d 160, 165 & n. 7 (5th Cir.1986) (indicating that award of attorneys' fees relating to claim involving disputed priority of liens in admiralty proceeding could be proper if party "acted in bad faith or with malice" by refusing, until the day of trial, to stipulate to a claim that had priority "under any conceivable analysis"; noting that "[a]ttorneys' fees are generally not awarded in admiralty cases" but may be awarded "in cases where the nonprevailing party has acted in bad faith throughout the course of the litigation"); *Cardinal Shipping Corp. v. M/S Seisho Maru,* 744 F.2d 461 (5th Cir.1984) (in case involving wrongful seizure of a ship, in order to collect attorneys' fees, plaintiff must prove that party seizing the vessel acted in bad faith, with malice, or with wanton disregard for rights of plaintiff).

[8]Deriving from Article VI of the Laws of Oleron, 30 Fed.Cas. 1171, 1174, maintenance and cure is designed to provide a seaman with food and lodging when he is injured or becomes sick while in the service of a ship: "[I]f by the [ship] master's orders and commands any of the ship's company be in the service of the ship, and thereby happen to be wounded or otherwise hurt, in that case they shall be cured and provided for at the costs and charges of the said ship." *Vaughan,* 369 U.S. at 531-32 & n. 4, 82 S.Ct. at 1000 & n. 4.

him, (2) damages resulting from the respondents' failure to pay maintenance and cure, and (3) attorneys' fees, the Court in *Vaughan* did not specify whether these three components of the total award were linked to distinct "degrees of fault" attributable to the respondents.[9]  However, in *Morales v. Garijak, Inc.,* 829 F.2d 1355 (5th Cir.1987), we clarified that:

> "If the shipowner, in failing to pay maintenance and cure, has not only been unreasonable but has been more egregiously at fault, he will be liable for punitive damages and attorney's fees. We have described this higher degree of fault in such terms as callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent.  Thus, there is an escalating scale of liability:  a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure.  If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages.  If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well." *Id.* at 1358 (footnote omitted).[10]

---

[9]In *Vaughan,* the Court observed simply that:

> "Our question concerns damages.  Counsel fees were allowed in *The Apollon,* 9 Wheat. 362, 379, 6 L.Ed. 111 [1824], an admiralty suit where one party was put to expense in recovering demurrage of a vessel wrongfully seized.  While failure to give maintenance and cure may give rise to a claim for damages for the suffering and for the physical handicap which follows, the recovery may also include "necessary expenses.' " *Id.* at 530, 82 S.Ct. at 999.

The Court then proceeded to describe the faulty conduct of the respondents without indicating whether the different components of Vaughan's recovery were separately identified with particular "degrees" of the respondents' fault.  We observed in *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496 (5th Cir.1995), that *Vaughan* did not address whether the "fee-shifting" associated with a finding of bad faith was compensatory or punitive in nature.  Nevertheless, we noted in *Guevara* that:

> "In the end, we need not definitely resolve whether *Vaughan* awarded attorney's fees as an item of compensatory or punitive damages.  The award clearly has a "make-whole' compensatory aspect, and, based upon the facts of *Vaughan,* the award also has a punitive aspect to the extent that it punished an abuse of the litigation process.  According to the case law, however, the punitive aspect of the *Vaughan* award *is* the bad-faith exception to the American Rule, and that exception is limited to a recovery of attorney's fees.  The *Vaughan* award was clearly *not* a punitive damages award in the tort sense of punishing the underlying conduct that gave rise to the litigation, and the developing case law does not support such a position." *Id.* at 1503.

[10]This analytical framework comports with the Court's award in *Vaughan;*  the Court characterized the respondents' attitude toward seaman Vaughan's (valid) claim for maintenance and cure as "callous" and "recalcitran[t]", and described the respondents' "default" in their duty as "willful and persistent." *Vaughan,* 369 U.S. at 531, 82 S.Ct. at 999.

7

In *Morales,* we addressed a claim for maintenance and cure and compensatory damages stemming from the respondent's (unreasonable and arbitrary) failure to pay maintenance and cure. *Id.* at 1359. A claim involving this "highest category" of liability—for conduct warranting an award of "punitive damages and attorneys' fees"—was not before this Court.

Finally, in *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496 (1995), we addressed a claim for punitive damages in this context, clarifying that:

> "[T]he bad-faith exception to the American rule, of which the *Vaughan* award is cited as an example, is not a punitive award in the "tort' sense of punishing the underlying conduct that gives rise to a plaintiff's claim.  Tort-like punitive damages are awarded on the basis of the merits of a case, while bad-faith fee-shifting punishes abuses of the litigation process." *Id.* at 1503.

Operating from this observation, we further noted that:

> "According to the case law [ ] the punitive aspect of the *Vaughan* award *is* the bad-faith exception to the American Rule, and that exception is limited to a recovery of attorney's fees.  The *Vaughan* award was clearly *not* a punitive damages award in the tort sense of punishing the underlying conduct that gave rise to the litigation, and the developing case law does not support such a position." *Id.*

We held in *Guevara* that, particularly in light of *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), punitive damages are no longer available in cases of willful nonpayment of maintenance and cure under the general maritime law. *Id.* at 1513.  In so holding, we also addressed to some extent the availability of punitive damages in contexts beyond maintenance and cure.  For example, we noted that, at least in certain scenarios, punitive damages are not available in a wrongful death action brought by the representative of a seaman under the unseaworthiness doctrine of general maritime law. *Id.* at 1507.  We additionally observed that punitive damages are unavailable under the Jones Act. *Id.* at 1506 & n. 7.[11]  Therefore, in light of *Guevara,* there is

---

[11]We observe that, prior to *Vaughan,* there is only one reported admiralty case in which punitive damages were actually awarded. *See Gallagher v. The Yankee,* 9 Fd.Cas. 1091 (N.D.Cal.1859), *aff'd* 30 Fd.Cas. 781 (Cir.Ct., N.D.Cal.1859) (involving conduct constituting an intentional tort, in which California vigilantes seized a person on land, sentenced him to exile, and handed him over to the defendant to execute the sentence by transporting him to the Sandwich Islands and leaving him there).  And, prior to *Vaughan* there are no reported admiralty cases awarding punitive damages for failure to pay maintenance and cure or allowing exemplary damages in an unseaworthiness claim.  As explained in *Guevara,* some courts have misread *Vaughan* as authorizing awards of punitive damages in admiralty.  The Supreme Court has *never*

8

arguably some question as to whether or not there remains a class of conduct, alluded to in *Morales,*

for which "punitive damages and attorney's fees" are available under admiralty law.[12]

We need not resolve this question in the present case, however, as there was no claim made,

nor finding sought, nor evidence adduced, that the defendants' conduct was so abusive of the

litigation process[13] that this conduct could be described "as callous and recalcitrant, arbitrary and

capricious, or willful, callous and persistent." *Morales,* 829 F.2d at 1358 (footnote omitted).

The district court held that:

"By failing to pay for the damages it obviously caused in an amount that Defendants stipulated and agreed was reasonable, the Defendants have not acted in an equitable manner in the equity action before this Court and have required Plaintiff to incur significant attorney's fees in order to recover the damages relating to its traffic fender system that were plainly owed to Plaintiff. Defendants' default herein was willful and persistent."

We find no support for this holding. Not acting "in an equitable manner" does not support

an award of attorneys' fees. Further, while the defendants agreed that the traffic fender system had

---

affirmed an award of punitive damages in an admiralty case, despite suggestions to the contrary in citations to *The Amiable Nancy,* 16 U.S. (3 Wheat.) 546, 4 L.Ed. 456 (1818) ("If this were a suit against the original wrong-doers, it *might be* proper to go yet farther, and visit upon them in the shape of exemplary damages the proper punishment ..." for intentional torts) (emphasis added).

[12]While an award of attorneys' fees was not before this Court in *Guevara,* we nevertheless observed that "*Vaughan* and *Miles* still *permit* the recovery of attorney's fees in maintenance and cure cases as long as the proper showing of egregious fault is made. *See, e.g., Morales,* 829 F.2d at 1358." *Guevara,* 59 F.3d at 1513 (emphasis added).

[13]Within the analytical framework established by *Vaughan* and its progeny, it is clear that we are concerned only with the present defendants' alleged abuse of the litigation process, and not with the nature of the tort underlying this law suit:

"[T]he bad-faith exception to the American rule, of which the *Vaughan* award is cited as an example, is not a punitive award in the "tort' sense of punishing the underlying conduct that gives rise to a plaintiff's claim. Tort-like punitive damages are awarded on the basis of the merits of a case, while bad-faith fee-shifting punishes abuses of the litigation process.... The *Vaughan* award was clearly *not* a punitive damages award in the tort sense of punishing the underlying conduct that gave rise to the litigation, and the developing case law does not support such a position." *Guevara,* 59 F.3d at 1503.

Moreover, the present law suit involved a claim of ordinary negligence, or at very most gross negligence; no claim of recklessness, "willful and wanton" misconduct, or the like was ever made by the plaintiff in this case.

been damaged in a certain amount, their position throughout this litigation was that the plaintiffs' failure, upon request, to open the drawbridge promptly and fully caused or contributed to this damage.[14] There was no evidence adduced that the defendants took this position maliciously or in bad faith, nor that they failed to comply with discovery requests, filed frivolous pleadings, or otherwise abused the litigation process. In this respect, there is no support for the court's finding that the defendants committed any "default," much less that such "default [ ] was willful and persistent."

The district court additionally observed that:

"[T]he defense offered by the Defendants in regard to the claim of this case borders on the frivolous, is unsupported factually from a common sense standpoint, is contradictory factually even as regards its own merits, and is utterly incredible to the Court in any respect.... It is necessary to award Plaintiff its attorney's fees in order to make Plaintiff whole."

As noted briefly above, the defense generally constituted a legally reasonable or arguable response to the plaintiff's claims. And, a defendant certainly has the right to put a plaintiff to his factual burden of proof. The district court's observations that this defense was "unsupported *factually,*" "contradictory *factually,*" and "utterly incredible" apparently stem from the court's determination *after trial* that the defendants' witnesses were not credible.[15] While this determination certainly supports

_____

[14]The defendants took the legally reasonable or arguable position that, upon receiving the tug boat's initial radio communications requesting that the bridge be opened, the plaintiff had a statutory duty to promptly and fully open the drawbridge. See note 2, *supra.* The defendants cited case law in support of this position. *See Florida East Coast Railway Co. v. Revilo Corp.,* 1979 A.M.C. 1888 (M.D.Fla.1979), *aff'd,* 637 F.2d 1060 (5th Cir.1981) (presumption of fault for striking a fixed object does not apply where a drawbridge contributes to a collision by delaying in opening or not opening at all).

[15]As several critical links in the chain of events leading up to the allision were in dispute at trial—and the parties' respective arguments rested heavily upon these conflicting views of the facts—this law suit turned largely on the eyewitness testimony presented by the parties. In its Supplemental Findings of Fact and Conclusions of Law, the court revealed that it had not found the testimony offered by the defendants' eyewitnesses to be credible. Beginning with the testimony of Mate Ebert, the court found that the version of the facts submitted by Ebert in his accident report was "unpersuasive" and (with respect to distances) "incredible." Next, turning to the testimony of Captain Borres, the court characterized his statements regarding distances as "incredible and internally inconsistent." Likewise, the court described the testimony of Earl Hatfield regarding distances as "incredible" and found Hatfield's testimony to be "at stark variance" with the testimony of other eyewitnesses. Finally, the court found the conclusions and findings of Captain Kleinpeter, an expert witness for the defense, to be "unsupported" and "incredible."

10

the court's assessments of fault and liability, it does not support the court's assertion that "this case borders on the frivolous," much less any determination that the defense position in or conduct of the litigation was so egregious and in bad faith as to authorize an award of attorneys' fees under *Alyeska*.[16] The district court took pains to praise counsel for their conduct in this litigation,[17] and this praise undercuts any suggestion that the district court viewed the defense as abusive of the litigation process. Under *Alyeska* there is simply no basis for an award of attorneys' fees here.

## Conclusion

We reverse the award of attorneys' fees and remand to the district court with direction to enter judgment consistent herewith.

REVERSED and REMANDED.

---

[16]Nor do we find any basis for concluding that the defendants' conduct in the litigation of this law suit or otherwise was "callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent." *Morales,* 829 F.2d at 1358 (footnote omitted).

[17]The court prefaced its observations that the defense "border[ed] on the frivolous" with the following language: "In this case, notwithstanding the fine efforts of counsel for defendant, which the Court only commends and finds no impropriety with in any respect whatsoever ..." Moreover, at the close of its remarks regarding the award of attorneys' fees, the court addressed counsel for both sides and offered additional praise:

> "All right. Well, again, I would like to thank each of you for your thoughtfulness and your assistance throughout the resolution of this case. I would like to commend each of the parties again, notwithstanding the mechanics of the resolution of the case, for a superb job in the preparation of and presentation of the case. I'm very pleased that each of the attorneys here is an officer of this court and I look forward to many opportunities to work with each of you in the future."