**MARINE OIL TRADING LIMITED, Plaintiff,**

v.

**MOTOR TANKER PAROS, Her Engines, Tackle, Appurtenances, Furniture, Cargo, etc., in rem, and Chemex, Ltd. Nevis, in personam, Defendants.**

No. Civ.A. 2:02CV800.

United States District Court, E.D. Virginia, Norfolk Division.

May 14, 2003.

John David Padgett, Lee Allen Handford, McGuire Woods LLP, Norfolk, VA, for plaintiff.

Geoffrey Footner Birkhead, Vandeventer Black LLP, Norfolk, VA, for Defendants.

### ORDER AND OPINION

FRIEDMAN, District Judge.

This matter is before the court on defendant Erin Shipping's motion to dismiss, filed on behalf of the M/T PAROS, and the plaintiff's motion for default judgment. After examination of the briefs and record, this court determines oral argument is unnecessary because the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. The defendant's motion to dismiss is GRANTED, and the plaintiff's motion for default judgment is DENIED.

### I. Factual and Procedural Background

This action arises from a breach of contract. The plaintiff, Marine Oil Trading Limited, is a British corporation that supplied fuel bunkers to the PAROS. The PAROS is owned by defendant Erin Shipping, a Maltese corporation. The plaintiff

supplied the bunkers to the charterer of the PAROS, Chemex Ltd. Nevis, a St. Kitts and Nevis corporation, while it called on ports in Spain and Egypt. Marine Oil alleges that Chemex has not paid for the bunkers. The PAROS was arrested in this district, and this arrest represents the only contact with the United States regarding this dispute. The plaintiff has sued the ship, in rem, and a number of defendants, in personam. Most of these defendants have been voluntarily dismissed, leaving the PAROS and Chemex as the only remaining defendants. Marine Oil has filed a motion for default judgment against Chemex, which has not filed an answer.

In its motion to dismiss, Erin Shipping claims that the contract is governed by choice of law and forum terms that deprive this court of jurisdiction.[1] Erin claims that any contractual disputes were to be litigated in the English High Court according to English law. Jurisdiction in this court was premised on the vessel's seizure which was justified by the existence of a maritime lien on the vessel. This lien arises under American law by virtue of the contract between Chemex and the plaintiff. According to Erin Shipping, there is no such lien available under English law based on the facts of this case. Consequently, if English law applied, there could be no lien and nothing to support the vessel's seizure in an American port; therefore, the court would have to dismiss the case for lack of jurisdiction. The issue, then, is whether the plaintiff possesses a maritime lien on the PAROS that would permit the arrest of the vessel and the instant in rem proceeding against it. The court must decide what law to apply, English or American, to ascertain the existence of the maritime lien.

The arrest of the ship and the instant in rem proceeding were accomplished pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure. Rule C allows an action in rem to be brought if there exists a maritime lien or where a federal statute specifically permits an action in rem. *See* Fed.R.Civ.P. Supp. R. C(1)(a) and (1)(b). Rule C is a means of enforcing certain rights and without such a right, either a valid maritime lien or a statutory right, a plaintiff cannot proceed in rem. The parties agree that in the absence of a maritime lien, the court has no jurisdiction and the PAROS should be dismissed.

## II. Analysis

### A. Maritime Liens

A maritime lien is a security interest in a vessel that "developed as a necessary incident of the operation of vessels." *Silver Star Ents. v. SARAMACCA MV*, 82 F.3d 666, 668 (5ᵗʰ Cir.1996). The maritime lien "arises in favor of the creditor by operation of law ... and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." *Id.* A maritime lien can arise even when the owner of the ship is not a party to the contract, and it passes with the ship when it is sold, even if the new owner is unaware of the existence of the lien. *See* William Tetley, *Maritime Liens and Claims* 59–60 (2d ed.1998). Because it is such a powerful right, the law of most nations construes the lien narrowly and confines its applicability to a narrow set of contexts. Contrary to most nations, American law takes a very broad view of maritime liens.

In particular, under American law, a lien arises to secure creditors who provide "necessaries"—"supplies, repairs and

1. The motion to dismiss also invoked the doctrine of forum non conveniens, but the defendant never briefed this particular issue.

equipment (and in some jurisdictions other goods and services) ordered on the credit of the ship and which are generally beneficial to the ship.…" *Id.* at 551. The maritime lien for necessaries arose in order to allow a ship on a voyage to obtain supplies in a foreign port while it was out of touch with its owners. Prior to modern systems of communication, like the telephone, the supplier had no way of relying on the credit of the shipowner—not knowing anything about that owner. Consequently the ship itself was used as credit for the supplies given, allowing the ship to complete its voyage. *See id.* at 617. This situation no longer exists, as modern technology permits a supplier to check on the shipowner or the ship charterer to determine if credit should be extended. Perhaps owing in part to this fact, the 1967 Liens & Mortgages Convention abolished the lien for necessaries. *See id.* at 552.

■ Today, under the law of most nations including the United Kingdom, a claim for necessaries gives rise only to a statutory right in rem. The United States and France are the two exceptions, both providing for a maritime lien. *See id.* at 551; 46 U.S.C. § 31301(4). Necessaries include fuel bunkers; therefore, the plaintiff may have a maritime lien on the vessel and a right to arrest the vessel and proceed in rem if American law is controlling.[2] *See First Marine Distribs., Inc. v. M/V MARYLOU, II,* 1996 WL 870726 (D.Md. Sept.30, 1996) (unpublished). The defendant asserts, however, that the contract governing the transaction at issue provides for the application of English law, which does not recognize a maritime lien under the facts of the case.

## B. The Contract Terms

The defendant relies on a clause in the relevant contract (the MOBCO contract)[3] that states in pertinent part: "The Agreement shall be governed by and construed in accordance with English law and the parties submit to the jurisdiction of the English High Court of Justice." Pl's. Ex. 3 at 25. This sentence clearly chooses the law and forum that will govern any disputes arising under the contract. Such contractual choice of forum and choice of law provisions are presumptively valid and should be given full effect. *See Ryan–Walsh, Inc. v. M/V OCEAN TRADER,* 930 F.Supp. 210, 219 (D.Md.1996); *Sembawang Shipyard, Ltd. v. Charger, Inc.,* 955 F.2d 983, 986 (5th Cir.1992); *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (discussing choice of forum). Neither party has attempted to contest the validity of this contract provision and the court assumes that it is enforceable. The issue before the court consists only of its interpretation, not its validity. According to the defendant, the quoted language clearly evinces an intent to be governed by English law alone. The defendant points to a number of cases where courts have held that similar choice of law terms mandated applying foreign law. *See, e.g., Sembawang Shipyard,* 955 F.2d at 986 (noting "any dis-

2. The existence of a lien is not a foregone conclusion even if American law applies. The court notes that this case involves a contract amongst foreign parties, over a foreign ship, regarding transactions that occurred in foreign ports. There is case law holding that a lien does not arise under such circumstances. *See Trinidad Foundry and Fabricating, Ltd., v. M/V K.A.S. CAMILLA,* 966 F.2d 613 (11th Cir. 1992).

3. The fuel bunkers were ordered through Island Marine Oil Brokers, which provided "Bunker Confirmations" for each order. The Confirmations explicitly incorporated Marine Oil's Terms and Conditions, which essentially constitute the "MOBCO contract" at issue. *See* Pl's. Exs. 1, 2.

pute" arising from transaction would be governed by Singapore law).

Of course, the analysis does not end with this provision as it is qualified by the sentence that follows, which the defendant did not mention in its initial brief. The contractual clause containing the choice of law and forum also states that "[n]othing in this clause, shall, however, preclude the Company, in the event of a breach of the Agreement by the Customer, from taking any such action or actions as it shall in its absolute discretion consider necessary to enforce, safeguard or secure its rights under the Agreement in any Court or Tribunal or any state or country." Pl's. Ex. 3 at 25. The plaintiff argues that this statement serves as an exception to both the choice of law and choice of forum in the sentence it precedes, rendering the choice of law and forum permissive. In other words, the plaintiff may choose to pursue litigation in any forum and under any governing law it chooses. The defendant counters that this sentence acts as an exception to the choice of forum only, not the choice of law. As a result, while the plaintiff might be able to bring an action in a forum other than the English High Court, English law still controls.

In addition to the contract's choice of law and forum and the exception to it, the plaintiff notes the existence of a separate "Liens" provision in the contract providing that a lien is created over the vessel for the price of the product supplied.[4] *See* Pl's. Ex. 3 at 12. The plaintiff argues that to give meaning to this term of the contract, the court must conclude that the parties intended to apply American law if the occasion arose.

## C. The Relevant Case Law

In support of its contention, the plaintiff relies on *Liverpool and London Steamship Prot. and Indem. Assoc. v. QUEEN OF LEMAN MV*, 296 F.3d 350 (5th Cir.2002), which concerned contractual provisions similar to the instant ones. Rather than having a single relevant blanket choice of law provision like those occurring in cases the defendant cites, the contract in *QUEEN OF LEMAN* contained three relevant provisions analogous to the three at issue in this case. First, there was a blanket choice of law term, like the choice of law/forum provision in the MOBCO contract. Second, there was an exception to this term, as there is in the instant case. Finally, there was a lien provision, much like the one present here as well.

The choice of law provision in *QUEEN OF LEMAN* provided that English law generally governed the contract and the parties agreed that under English law, there would be no maritime lien. The contract's lien provision stated that the plaintiff would have a "lien on ships," and that the application of English law was subject " 'to the right of the [plaintiff] . . . to enforce its right of lien in any jurisdiction in accordance with local law in such jurisdiction. . . .' " *QUEEN OF LEMAN*, 296 F.3d at 353. The contract also provided for a choice of forum—as here, the English High Court of Justice—with the qualification that "[n]othing herein shall affect or prejudice the right of the [plaintiff] to take action and/or commence proceedings in any jurisdiction to enforce its right of lien on ships or to otherwise obtain security by seizure, attachment, or arrest of assets for any amounts owed to the [plaintiff]." *Id.*

---

4. For purposes of clarity and simplicity, the three relevant parts of the contract will be referred to as the "choice of law/forum provi- sion," the "exception provision," and the "lien provision."

An intervenor in that case argued that the local law qualification was limited to procedural enforcement of the lien rather than determining the existence of the lien, which would be determined by English law. As noted, defendant Erin Shipping has made a similar claim in this case. The court in QUEEN OF LEMAN concurred with the plaintiff's alternative contention that this reading of the contract would render meaningless the language granting a "lien on ships" and providing for enforcement of a lien in "any jurisdiction in accordance with local law." The court concluded that if English law controlled and there was no lien, then there would be no right that needed to be enforced in accordance with local law. Id. Furthermore, the court concluded that the "lien on ships" phrase referred to a maritime lien and not to a broader category of " 'any type of seizure priority lien.' " Id. Accordingly, the court held that "to give meaning to the entire contract, the determination of whether a maritime lien exists in the first place should be determined by United States Law." Id. at 354.

The plaintiff in the instant case likens its contractual choice of law/forum provision to this language, whereas the defendant finds the provision to be comparable to cases it cites wherein the terms merely provided that a contract was to be governed by the law of a particular nation with no exceptions. The court must determine which characterization best matches the instant contract. Predictably, the language of the MOBCO contract does not point as clearly to one interpretation or the other as do the examples that each party offers. The instant choice of law/forum provision is clearly not absolute or mandatory in certain respects, unlike the examples put forth by the defendant, nor do the contract's provisions explicitly provide the plaintiff with the ability to enforce a right of lien according to local law, as in the plaintiff's example from QUEEN OF

LEMAN. Instead, the term at issue falls somewhere in the very gray middle ground.

Most of the extant case law refers to blanket choice of law provisions, making resolution of the issue quite easy for those courts. Aside from QUEEN OF LEMAN, there are two other decisions where courts faced contractual language specifying that there would be a lien on the ship and delineating an exception to a choice of law. In Ocean Marine Mut. Ins. Ass'n v. M/V LIA, 2000 A.M.C. 365, 1999 WL 679671 (E.D.La. Aug.27, 1999) (unpublished), the contract provided that "any contract of insurance between the Association and a Member shall be governed by and construed in accordance with English law." Id. at *2. It also stated in a separate provision that "the [plaintiff] shall have a lien on every entered or formerly entered ship belonging to the [defendant] for any sums due...." Id. Another term gave the plaintiff the right to "commence and maintain any action to recover any sums which the [plaintiff] may consider to be due to it from [the defendant] in any jurisdiction. The [plaintiff] may take proceedings in any jurisdiction in order to obtain security for any claim it asserts." Id.

The court concluded that the first provision established a clear choice of English law and that the final two provisions did not carve out an exception for maritime liens or indicated American law applied to determining the existence of a maritime lien. The court interpreted the second provision as merely establishing a contractual lien, and the exception provision as addressing the choice of forum and pertaining only to the enforcement of its rights, not a choice of law. See id. at *3.

The LIA decision certainly favors the defendant's claim that the exception provision only concerns choice of forum not choice of law. However, the court is not

convinced that its reasoning is entirely sound, primarily because the decision seemed to be premised on the idea that a "contractual" lien is somehow different from a true maritime lien, which does not appear to be true. While a maritime lien does arise by operation of law rather than by agreement between the parties, there are a number of reasons for including contractual language alerting the parties to the existence of a lien on the ship. This language does not, however, actually give rise to the lien.

Additionally, the claimed exception to the choice of law and forum provisions in *LIA* was more easily construed as providing the discretion to use procedural mechanisms in alternative forums, rather than a forum's substantive law. In other words, it appeared to be a choice of forum exception alone. The court does agree, however, with the *LIA* court's understandable hesitance to create such a specific, weighty exception to the plaintiff's blanket choice of law and forum in the absence of clear, explicit language.

There is another case of greater importance to the court's inquiry because it deals with the very same contract terms at issue here. In *Marine Oil Trading Ltd. v. M/V SEA CHARM,* No. 02–2281, 2003 WL 292309 (E.D.La. Feb.10, 2003) (slip op.), under identical facts, Marine Oil attempted to assert a maritime lien over a ship seized in an American port. As it does here, Marine Oil relied on *QUEEN OF LEMAN* to support its contention that American law should determine the existence of such a lien, and English law should govern all other aspects of the contract. In *SEA CHARM,* the court pointed out, correctly, that the contract in *QUEEN OF LEMAN* and the contract at issue were distinguishable. The court analyzed the differences in the language employed in each contract and found this distinction to be material. The court concluded that Marine Oil's lack

of specificity was fatal because its contract contained no explicit language calling for the application of non-English law with regard to the existence of a lien. As a result, the court concluded that the contract called only for the general application of English law to all aspects of the contract and did not carve out an exception for maritime liens. *See SEA CHARM,* 2003 WL 292309 at *5–6. Additionally, the decision mentioned that a Panamanian court had already reached that conclusion regarding the same dispute between the parties. *Id.*

While the court does not agree entirely with the reasoning employed in *SEA CHARM,* the court does accept the conclusion that the MOBCO contract at issue in both *SEA CHARM* and the instant case, is materially different from the relevant contract terms discussed in *QUEEN OF LEMAN.* The court does not agree, however, that *QUEEN OF LEMAN* establishes a baseline of the minimum specificity a contract must have to create a lien exception to a general choice of law provision. In other words, the court in *QUEEN OF LEMAN* did not state that any contract employing more ambiguous or broader language could not successfully create the contractual relationship that Marine Oil contemplates. However, the court does believe that the MOBCO contract is of sufficient generality that it cannot be interpreted as evincing a clear intent to apply non-English maritime lien law. When carving out such a unique exception to a blanket intent to apply English law, a party should be explicit. This is particularly so in light of the disfavored status of maritime liens for necessaries in the overwhelming majority of countries.

The court has already discussed that owing to the great power of the maritime lien, their applicability is held to a narrow set of contexts by most nations. With

regard to necessaries, only the United States and France recognize a maritime lien and it would appear that the primary rationale for a lien for necessaries no longer has force in the modern would. As a result, it is reasonable to conclude that most parties contracting for necessaries would not expect a lien to arise where the contract does not invoke American law or involve an American supplier, particularly where the contract calls for the general application of English law. Furthermore, an exception to a choice of law provision is much more unusual than a permissive choice of forum provision that provides for a default forum but gives the drafter the right to proceed in any convenient forum. Choice of law is of far greater strategic importance to the parties than a choice of forum, which in great respect is simply a matter of convenience.

■■■ A drafting party's claim that its choice of law was permissive should be subjected to very close scrutiny, particularly in a non-negotiated form contract that the charterer may never have even seen but which was simply adopted by reference. The court finds that, on its face, the term in question is more logically read as an exception to the plaintiff's choice of forum. It refers to using whatever procedural mechanisms are available in the particular forum chosen to litigate a dispute. Maritime liens are not procedural but, rather, are an aspect of substantive maritime law. *See Amstar Corp. v. S/S ALEXANDROS T.*, 664 F.2d 904, 908 (4ᵗʰ Cir.1981). The contract does not state, as the contract in *QUEEN OF LEMAN* did, that local law should apply with respect to the existence of a maritime lien. Furthermore, to the extent that the plaintiff intended to invoke local law, this intent is ambiguous. The court relies on the common law axiom that ambiguity in a contract is to be construed against the drafter—in this case, Marine Oil. *See Hendrick v. Brown & Root*, 50 F.Supp.2d 527, 533

(E.D.Va.1999) (collecting cases). Unlike the term at issue in *QUEEN OF LEMAN*, there is no language signaling an intent to invoke the specific maritime lien law of a particular forum if the opportunity arose and if such law favored the plaintiff. The court believes such language was necessary if the contract is to be interpreted in the manner the plaintiff contends. Consequently, English, not American, law should apply to determining the existence of a maritime lien. As the parties concede, the plaintiff has no lien for the provision of fuel bunkers under English law.

Finally, the court addresses the outstanding motion for default judgment. As noted, Chemex has not responded to the plaintiff's complaint and default has been entered against it. It appears to the court that it lacks jurisdiction to enter a judgment against this defendant. The undisputed facts indicate that both Marine Oil and Chemex are not incorporated in the United States. Marine Oil is an English company, and Chemex is a St. Kitts and Nevis corporation. The contract was drafted and executed outside of the United States and calls for the application of English law. All transactions between the parties took place in foreign countries. Finally, there has been no allegation of contact of any sort with the United States or this district except for the arrest of the PAROS. Having ruled there was no jurisdictional support for the arrest, the ship's presence in this district does not aid the plaintiff's attempt to sue Chemex in this court. Lacking any apparent basis for jurisdiction, the court will not enter default judgment against Chemex, and instead, will dismiss this party as well.

### III. Conclusion

Owing to the extreme rarity of the maritime lien, its disfavored status in most countries with regard to necessaries, and the particular language employed in the

MOBCO contract, the court cannot conclude that this term is to be interpreted in the manner that the plaintiff claims. The plaintiff's reading of the clause essentially would provide that the plaintiff could apply whatever law favored it whenever it chose. Unless clearly delineated in the contract and a clearly bargained-for term of the agreement, the court cannot interpret the contract in that manner. The court, therefore, concludes that English law is applicable to deciding whether there is a maritime lien for necessaries. As has been discussed, no such lien is recognized under English law; therefore, the plaintiff had no substantive right to support an arrest of the PAROS in this forum. This court lacks jurisdiction to hear the plaintiff's claims against the vessel. Finally, the court concludes it has no jurisdiction over the defendant Chemex either. Accordingly, the court **GRANTS** the defendant's motion to dismiss the in rem action against the M/T PAROS and **DENIES** the plaintiff's motion for default judgment against Chemex Ltd. Nevis. It is **ORDERED** that the M/T PAROS and Chemex Ltd. Nevis are hereby **DISMISSED**, and the plaintiff's action is **DISMISSED** in its entirety.

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record.

It is so **ORDERED**.