465 F.3d 144
 BOMINFLOT, INCORPORATED; Bominflot Ltd, Plaintiffs-Appellants,
v.
THE M/V HENRICH S (IMO No.9158513), her engines, tackle, nets, gear, apparel, appurtenances, etc., in rem, Defendant-Appellee, and
Hamburg Sud, as Successor-in-Interest to Kien Hung, Defendant, and
H + H Schepers Reederei GMBH & Co KG MS Heinrich S, Intervenor/Defendant.
 No. 05-2242.
 United States Court of Appeals, Fourth Circuit.
 Argued May 23, 2006.
 Decided October 4, 2006.
 
 David B. Marvel, Robertson & Hollingsworth, Charleston, South Carolina, for Appellants. Julius H. Hines, Buist, Moore, Smythe, McGee, P.A., Charleston, South Carolina, for Appellee.
 Before WIDENER, WILLIAMS, and KING, Circuit Judges.
 Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge KING concurred. Judge WIDENER wrote a separate dissenting opinion.
 WILLIAMS, Circuit Judge.
 
 
 1
 Appellants Bominflot, Inc. and Bominflot Ltd. (collectively "Bominflot") appeal a district court order dismissing their maritime lien claim against Appellee THE M/V HENRICH S ("the Vessel"). We hold that because English law applies to this dispute, Bominflot cannot enforce a maritime lien against the Vessel. We therefore affirm the district court.
 
 I.
 
 2
 This case arises out of three provisions of fuel oil, known as "bunkers," delivered by Bominflot to the Vessel in February and March 2003.[1] Each provision was subject to contractual language contained in "Bominflot International Group of Companies General Conditions of Sale and Delivery effective from July 1, 2000" ("General Conditions"). (J.A. at 21-22.) Bominflot is an international conglomerate organized under the laws of the United States and the United Kingdom that, among other things, specializes in providing bunkers to vessels. The Vessel, a German-flagged ship owned by German firms, was—during the time of the relevant bunker deliveries—under time charter to Kien Hung Shipping Co. Ltd. of Taiwan ("Kien Hung").[2] Kien Hung has since become insolvent and has liquidated its assets. Bominflot alleges that it never received any payment for the bunkers.
 
 
 3
 On August 28, 2003, Bominflot brought this action in the United States District Court for the District of South Carolina under 28 U.S.C.A. § 1333 (West 1993) (granting district courts original jurisdiction in civil admiralty cases). Bominflot claimed, inter alia, a maritime lien against the Vessel pursuant to Rule C of the Federal Supplemental Rules of Certain Admiralty and Maritime Claims in conjunction with the Federal Maritime Lien Act (FMLA), 46 U.S.C.A. § 31342 (West Supp. 2005).[3]
 
 
 4
 The district court dismissed the action under Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding that Bominflot had failed to state a claim upon which relief may be granted because English law applied to the dispute and English law does not recognize the existence of maritime liens for bunkers.
 
 
 5
 Bominflot timely appealed. We have jurisdiction to review the district court's final order under 28 U.S.C.A. § 1291 (West 1993).
 
 II.
 
 6
 We review de novo the district court's grant of the Vessel's 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Davani v. Va. Dep't of Trans., 434 F.3d 712, 715 (4th Cir.2006). "[A] Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir.1999).
 
 
 7
 Bominflot points to two specific clauses of the General Conditions in support of its argument that it is entitled to a maritime lien against the Vessel. The first clause relates to the enforcement of a lien against the Vessel:
 
 
 8
 7.14 Products and services delivered under a Contract shall be made not only on the account of Buyer but also on the account of the receiving vessel. Buyer warrants that Seller has the rights to assert and enforce a lien against the receiving vessel for the amount of the Products and Services provided, plus without limitation, any other expenses related to enforcement of the lien.
 
 
 9
 (J.A. at 22.) The second clause is a choice of law clause and forum selection provision:
 
 18. Governing Law
 
 10
 18.1 This agreement is subject to the law and jurisdiction of the courts of England, or other law and jurisdiction as specified by Seller in the Contract. However, nothing in this clause shall, in event of breach of the agreement by Buyer, preclude Seller from taking any such action as it shall in its sole discretion consider necessary to enforce, safeguard or secure its rights under the Contract in any court or tribunal in any state or country.
 
 
 11
 (J.A. at 22.)
 
 
 12
 Bominflot contends that when read together, these clauses required the district court to apply United States law, which allows for a maritime lien for bunkers, even though Section 18.1 states that the contract was subject to the law of England, which does not. As we explain below, the General Condition clauses cannot be read to provide that U.S. maritime lien law should have applied. We begin by explaining—to the extent necessary—the scope and object of maritime liens in England and the United States, before reaching the merits of Bominflot's argument.
 
 A.
 
 13
 A maritime lien serves as a powerful, unusual in rem enforcement in admiralty:
 
 
 14
 The maritime lien has been described as one of the most striking peculiarities of Admiralty law, constituting a charge upon ships of a nature unknown alike to common law and equity. It arises by operation of law and exists as a claim upon the property, secret and invisible. A maritime lien may be defined as: (1) a privileged claim, (2) upon maritime property, (3) for service done to it or injury caused by it, (4) accruing from the moment when the claim attaches, (5) traveling with the property unconditionally, (6) enforced by means of an action in rem.
 
 
 15
 Griffith Price, The Law of Maritime Liens 1 (1940), quoted in Black's Law Dictionary 943 (8th ed.2004). "Quite different from a common law lien, a maritime lien is not simply a security device to be foreclosed if the owner defaults. The vessel itself is viewed as the obligor whether or not the owner is also obligated." Amstar Corp. v. S/S Alexandros T, 664 F.2d 904, 908-909 (4th Cir.1981).
 
 
 16
 Adopted from civil law, maritime liens are stricti juris and cannot be created by agreement between the parties; instead, they arise by operation of law, often depending on the nature and object of the contract. See The Steamship Yankee Blade, 60 U.S. 82, 89, 19 How. 82, 15 L.Ed. 554 (1856) (holding that maritime liens are "`stricti juris,' and cannot be extended by construction, analogy, or inference"); see also Redcliffe Americas Ltd. v. M/V Tyson Lykes, 996 F.2d 47, 50 (4th Cir.1993) (noting that a "maritime lien is a secret one, arising by operation of law"). As explained by Lord Justice Scott in the English case of The Tolten, a maritime lien "comes into existence automatically without any antecedent formality . . . and confers a true charge upon the ship and freight of a proprietary kind in favour of the `privileged' creditor. The charge goes with the ship everywhere, even in the hands of a purchaser for value without notice. . . ." United Afr. Co., Ltd. v. "Tolten", (1946) 79 Ll. L. Rep. 349, 356.
 
 
 17
 Because maritime liens confer such a powerful right, most nations—including England—limit or preclude their application. In England, admiralty judges traditionally recognized only a select group of maritime claims subject to maritime liens, "the principal being bottomry,[4] salvage, wages, masters' wages disbursements and liabilities, and damage." The Ripon City, (1897) P. 226, 242. Notably, claims for necessaries, including bunkers, are absent from this list. Claims for necessaries in England have therefore traditionally been "available only against the property of the person who owes the debt for necessaries; and the arrest need not be of the ship in question, but may be of any property of the defendant within the realm." The Heinrich Bjorn, (1885) 10 P.D. 44, 54. As such, they are similar to blanket liens against the debtor's property, not maritime liens against the vessel that travel with the ship.
 
 
 18
 The United States as well as a number of civil law nations, however, allow for broader use and enforcement of maritime liens, including the creation of a statutory right to a maritime lien for necessaries, see 46 U.S.C.A. § 31342 (providing that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel"), and William Tetley, Maritime Liens and Claims 551 (2d ed.1998) (noting that only a few nations, including the United States, give a claim for necessaries maritime lien status), which include bunkers, see 46 U.S.C.A. § 31301(4) (West Supp.2005) (defining "necessaries" as "includ[ing] repairs, supplies, towage and the use of a dry dock or marine railway"). Moreover, Rule C of the Federal Rules of Civil Procedure's Supplemental Rules for Certain Admiralty and Maritime Claims provides: "An action in rem may be brought . . . [t]o enforce any maritime lien . . . [w]henever a statute of the United States provides for a maritime action in rem."
 
 
 19
 The distinction between U.S. and English maritime lien law is central to this case because under U.S. law, a company supplying a vessel with bunkers has a maritime lien on the vessel; whereas under English law, that company would have only a less powerful statutory right in rem, which is only a right to arrest the debtor's ship (or other property). See The John G. Stevens, 170 U.S. 113, 117, 18 S.Ct. 544, 42 L.Ed. 969 (1898) ("Claims for necessaries [in England] do not possess, ab origine, a lien, but carry only a statutory remedy against the res, which is essentially different." (quoting The Gustaf, (1862) Lush 506, 508)). Thus, in order to determine whether Bominflot is entitled to a maritime lien for necessaries, we must determine whether English or U.S. law controls.
 
 B.
 
 20
 Ordinarily, this case would pose thorny conflicts of law questions because of the myriad interests at stake. For example, the Vessel is a German-flagged ship that is owned by a German company, the time charterer was Taiwanese, Bominflot is an international conglomerate, the bunker deliveries were made while the ship was located in South Africa[5] and Brazil,[6] and the action was commenced in the United States.
 
 
 21
 This question is made easy, however, by the fact that both parties agreed to subject the agreement "to the law . . . of England or other law . . . as specified by [Bominflot] in the Contract." (J.A. at 22.) Because no "other law" is specified on the face of the contract and public policy does not counsel against it, we will respect the parties' intentions and apply English law.[7] See, e.g., Lauritzen v. Larsen, 345 U.S. 571, 588-89, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12-13, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect."); Hawkspere Shipping Co. v. Intamex, S.A., 330 F.3d 225, 233 (4th Cir. 2003) ("Where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice." (internal quotation marks and alterations omitted)).
 
 
 22
 Bominflot nonetheless argues that even though English law is applicable, the General Conditions allow for an exception to English law in the case of maritime liens. It bases its argument on the fact that—in addition to the English choice of law clause—different sections of the General Conditions provide that (1) "[b]uyer warrants that Seller has the right to assert and enforce a lien against the receiving vessel," and (2) Bominflot may "enforce, safeguard or secure its rights under the Contract in any court or tribunal in any state or country." (J.A. at 22.) Bominflot contends that if we fail to recognize the application of United States law here, we would render such language meaningless. See Restatement (Second) of Contracts § 203 (1981) (stating that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").
 
 
 23
 Bominflot's argument is based in part on the Fifth Circuit's decision in Liverpool & London SS Prot. and Indem. Ass'n Ltd. v. Queen of Leman MV, 296 F.3d 350 (5th Cir.2002). In Queen of Leman, the court held that an insurer could enforce a maritime lien for necessaries under United States law even though the contract otherwise called for the general application of English law. Id. at 355. The pertinent language of the contract in Queen of Leman provided a right to "a lien on the ship[]." Id. at 353. More important, the contract provided that the insurer could "enforce its right of lien in any jurisdiction in accordance with local law in such jurisdiction." Id. (emphases added). The contract then stated that nothing in the contract should affect the supplier's ability "to enforce its right of lien on ships or to otherwise obtain security by seizure, attachment or arrest of assets for any amounts owed to the [a]ssociation." Id.
 
 
 24
 Bominflot's General Conditions notably differ from those considered in Queen of Leman. The essential difference is that Bominflot's General Conditions do not state that lien rights could be enforced "in accordance with local law," as the contract did in Queen of Leman. Quite the contrary, the General Conditions fail to provide any exception to the general English choice of law provision. Bominflot argues, however, that the General Conditions do as much by allowing it to "safeguard or secure its rights under the Contract in any court or tribunal in any state or country." (J.A. at 22.) This non-lien-specific provision, however, is plainly a forum selection clause rather than a choice of law clause.[8] The clause relates only to where, i.e., what forum, Bominflot may bring an action to enforce its rights. But it is silent concerning which law is to govern.[9] Thus, if we are to respect the intent of the parties as evinced by § 18 of the General Conditions, English law must apply.
 
 
 25
 Bominflot, however, further contends that the General Conditions' buyer's "warranty" that a lien exists would be read meaningless if we do not recognize a maritime lien. There are two flaws in this argument. First, the right to a maritime lien for necessaries under the FMLA cannot be created through simple warranty. Instead, the right arises by matter of law when, inter alia, "a person provid[es] necessaries to a vessel." 46 U.S.C.A. § 31342. Second, there is nothing in the language of the General Conditions tending to suggest that the general lien warranty refers to solely a maritime lien for necessaries of the sort enforceable under Rule C. The warranty can be read, for example, to refer to English actions in rem against a ship where the ship is owned by "the person who would be liable on the claim in an action in personam." The Yuta Bondarovskaya, (1998) 2 Lloyd's Rep. 357, 359; see The Heinrich Bjorn, (1885) 10 P.D. 44, 54 (recognizing—under English law—the existence of an in rem proceeding "against the property of the person who owes the debt for necessaries"); see also North End Oil, Ltd. v. M/V Ocean Confidence, 777 F.Supp. 12, 14 (C.D.Cal.1991) (interpreting similar language "as statements of the rights that the parties have under the applicable English law").
 
 
 26
 Were we to conclude otherwise, we would allow Bominflot to escape its own choice of law clause through the ambiguity and sloppiness of other provisions of its General Conditions. See Restatement (Second) of Contracts § 206 (1981) ("[T]hat meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."); see also Marine Oil Trading Ltd. v. Motor Tanker Paros, 287 F.Supp.2d 638, 644 (E.D.Va.2003) ("When carving out such a unique exception to a blanket intent to apply English law, a party should be explicit. This is particularly so in light of the disfavored status of maritime liens for necessaries in the overwhelming majority of countries."). Nothing in Queen of Leman is to the contrary. There, the case turned on the Fifth Circuit's determination that the contract's English choice of law clause was qualified by an "explicit exception" arising in the context of maritime liens. Queen of Leman, 296 F.3d at 354. As noted, however, Bominflot's contract contains no such explicit exception.[10]
 
 III.
 
 27
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 AFFIRMED
 
 
 
 Notes:
 
 
 [1]
 On February 6, 2003, bunkers in the amount of $202,431.49 were delivered to the Vessel in South Africa. On February 16, 2003, bunkers in the amount of $281.581.47 were delivered to the Vessel in Brazil. Finally, on March 10, 2003, $141.272.33 worth were delivered to the Vessel in South Africa
 
 
 [2]
 As part of the time charter, Kien Hung was responsible for any purchases of bunkers. Kien Hung was also bound by the Vessel's "Non-Lien Provision Clause," which prohibited Kien Hung from subjecting the Vessel's owners to any lien "which might have priority over the title and interest of the Owners." (J.A. at 80.)
 
 
 [3]
 Bominflot amended its complaint by adding anin personam claim pursuant to Rule B of the Federal Supplemental Rules of Certain Admiralty and Maritime Claims. On October 27, 2005, however, Bominflot moved to dismiss its Rule B claim on consent and the claim was dismissed on October 31, 2005. Bominflot appeals only the district court's decision with respect to its Rule C maritime lien claim.
 
 
 [4]
 "The bottomry bond is a sort of mortgage on a ship, entered into for the purpose of raising money in case of necessity in a foreign port. The advance of communications has caused bottomry . . . bonds to pass virtually out of use."Black's Law Dictionary 188 (8th ed.2004) (quoting Grant Gilmore & Charles L. Black Jr., The Law of Admiralty § 1-10, at 25 n. 85 (2d ed.1975)) (alterations in original omitted).
 
 
 [5]
 South Africa's maritime lien law is based on English law and does not recognize a maritime lien for necessariesSee William Tetley, Maritime Liens and Claims 1371 (2d ed.1998). Accordingly, Bominflot could not make a maritime lien claim for the two bunker shipments to South Africa under South African law.
 
 
 [6]
 Brazil, like many other civil law jurisdictions, recognizes a maritime lien for necessariesSee William Tetley, Maritime Liens and Claims 1275 (2d ed.1998). Thus, Bominflot would have a maritime lien claim for the shipment to Brazil if Brazilian law applied. Although if such an action was instituted in Brazil, Brazilian courts would likely apply the law of the flag, see id. at 1276-77, and the claim would fail as German law does not recognize a maritime lien for necessaries. See id. at 1309.
 
 
 [7]
 Bominflot offers an unconvincing argument that the words "`subject to' only suggest[] that English law and jurisdiction may apply, not that the contract is definitively governed" by English law. (Appellant's Br. at 18.) Quite the contrary, General Condition 18, under which the choice of law clause is found, is titled "Governing Law." (J.A. at 22.) Moreover, the phrase "subject to the law . . . of England" means that the contract is "placed under authority or control" of English lawMerriam-Webster's Collegiate Dictionary 1243 (11th ed.2003) (first definition of "subject"). In other words—in a choice of law clause— the phrase "subject to" denotes the same meaning as the phrase "governed by."
 
 
 [8]
 Bominflot contends that the forum selection clause is useless if it is not connected with a parallel choice of law exception that allows Bominflot to enforce a maritime lien. This argument is without merit. There are plenty of reasons to issue a forum selection exception that are unconnected with choice of law concerns. For example, Bominflot may choose to enforce the General Conditions consistent with English law in jurisdictions other than England because of convenience, because the Vessel is located in a jurisdiction other than England, or because certain jurisdictions may not respect its choice of law clause
 
 
 [9]
 Unsurprisingly, since the Fifth Circuit's decision inQueen of Leman, district courts have refused to extend its holding by allowing for a maritime lien in cases where the contract contained language similar to the language used here, i.e., broad forum selection clauses in addition to general English choice of law clauses. Using almost identical language to that used by Bominflot, and in a jurisdiction bound by the Fifth Circuit's decision in Queen of Leman, the supplier in Marine Oil Trading, Ltd. v. M/V Sea Charm was allowed to "enforce, safeguard or secure its rights under the Agreement in any Court or Tribunal in any state or country." 2003 AMC 882, 887 (E.D.La.2003), available at 2003 WL 292309. The contract also stated that the supplier "may assert a lien against the vessel itself." Id. In that case, the court determined that the seller could "assert its rights under the agreement in any forum," but those rights "remain expressly determined by English law." Id. Thus, the seller could not enforce a maritime lien for necessaries. Likewise, in Marine Oil Trading Ltd. v. Motor Tanker Paros, again under nearly identical contractual language to what we have here, the court found that the case was meaningfully different from Queen of Leman because the contract the district court was reviewing was "of sufficient generality that it cannot be interpreted as evincing a clear intent to apply non-English maritime lien law." Id. Moreover, the court pointed out that "it is reasonable to conclude that most parties contracting for necessaries would not expect a [maritime] lien to arise where the contract does not invoke American law. . . ." Id. at 645.
 
 
 [10]
 We express no opinion on what the result would have been in this case had Bominflot's contract qualified its choice of law provision with a provision reserving "its right of lien in any jurisdiction in accordance with local law."Liverpool & London SS Prot. and Indem. Ass'n Ltd. v. Queen of Leman MV, 296 F.3d 350, 353 (5th Cir.2002). We note only that Bominflot's general conditions do far less than that.
 
 
 WIDENER, Circuit Judge, dissenting:
 
 28
 I respectfully dissent.
 
 
 29
 A maritime lien upon a vessel arises by statute and not by contract. See 46 U.S.C. § 31342(a)(1); Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940). As to the contract at issue in this case, the majority gives effect to the first sentence in the choice of law provision and then fails to give the same weight to the second sentence of the same provision. Even if the contract may be governed by English law, the provision continues:
 
 
 30
 However, nothing in this clause shall, in event of breach of the agreement by Buyer, preclude Seller from taking any such action as it shall in its sole discretion consider necessary to enforce, safeguard or secure its rights under the Contract in any court or tribunal in any state or country.
 
 
 31
 The decision of the majority precludes the seller from taking action to enforce its rights under the contract to deliver the oil. The case of Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940), is very nearly on the same facts as is this case and holds that under American law a supplier has a lien on the vessel, as well as, and in addition to, the promise to pay for the oil. See Herbert R. Baer, Admiralty Law of the Supreme Court § 12-7, at 306 (2d ed.1969).
 
 
 32
 Indeed, even if [the seller] is aware that the vessel with which he is dealing is under charter, he should not be charged with knowledge of the existence of any `no lien' clause absent affirmative evidence that he had received express notice from the owner or other reliable source that the vessel was not to be bound.
 
 
 33
 Steven F. Friedell, 2 Benedict on Admiralty, ch. III, § 40 (2005).
 
 
 34
 The only distinction in the governing law clause here and in Liverpool & London SS Prot. and Indem. Ass'n Ltd. v. Queen of Leman MV, 296 F.3d 350 (5th Cir.2002), is that the Queen of Leman contract provided that lien rights could be enforced "in accordance with local law." Here, the contract says that the seller may "enforce, safeguard or secure its rights under the Contract in any court or tribunal in any state or country." The broader right found in this case is bound to include the more narrow right conferred in Queen of Leman.
 
 
 35
 Whatever the law governing the contract, we should look to the American statute as well as the contract to determine the existence of a maritime lien on the vessel. There is no no-lien provision here as illustrated in Dampskibsselskabet. I am of opinion the seller in this case is entitled to a maritime lien against the vessel.